Blair M. Christensen
Assistant Attorney General
Office of Special Prosecutions
and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
Email: Blair_Christensen@law.state.ak.us

Attorney for Respondent Zee Hyden


IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| JERRY LEE DOUGLAS,        ) | |
|                     ) | |
|        Petitioner,    ) | |
|                     ) | |
|      vs.            ) | Case No. 3:03-cv-0221-JWS-JDR |
|                     ) | |
| SUPERINTENDENT ZEE HYDEN, ) | RESPONSE TO PETITION FOR |
|                     ) | WRIT OF *HABEAS CORPUS* |
|      Respondent.    ) | |
| _____ ) | |


INTRODUCTION

        Jerry Douglas was convicted of first-degree robbery after his defense

counsel made strategic decisions not to ask for jury instructions on the lesser-

included offense of theft and not to offer into evidence audiotapes of the robbery

victim's 911 call or police interview to further impeach the victim with prior

inconsistent statements.    Douglas filed a motion for a new trial (which the

Alaska Superior Court ordered treated as an application for post-conviction relief) claiming ineffective assistance of counsel because of the above-mentioned strategic choice. Douglas also claimed ineffective assistance from his defense counsel's alleged failure to investigate civil suits by and against the victim. Douglas further claimed prosecutorial misconduct from comments the prosecutor made during closing argument. After an evidentiary hearing, Alaska Superior Court Judge Elaine Andrews found that there was no merit to Douglas's claims and was affirmed by the Alaska Court of Appeals. Douglas has petitioned this court for *writ* of *habeas corpus*, but has failed to meet his burden of showing that the court of appeals unreasonably applied federal law or based its decision on an unreasonable determination of the facts.

## STATEMENT OF THE CASE

Facts

Mohammad Ali was a taxicab driver in Anchorage. [Docket No. 54, Tab G, "Trial Tr." 25]1  On May 13, 1999, at approximately 2:15 a.m., Ali was dispatched to pick up a fare at Apartment 99 of the Vista Grande Apartments on

---

1       Unless otherwise specified, all citations to transcripts and exhibits refers to the exhibits attached to the opening brief in support of petition for writ of habeas corpus filed in the present case as Douglas's Docket No. 54.  The same abbreviations will be used to lessen confusion.

West 14th Avenue. [Trial Tr. 34, 139-40] Ali arrived and picked up Douglas and his girlfriend and drove them to the Wal-Mart store in the Dimond Center so that they could return some merchandise. [Trial Tr. 35]

After they arrived at the Wal-Mart, Douglas asked Ali to wait for them while they went into the store. [Trial Tr. 35] Douglas and his girlfriend came out a short time later and Ali drove them back to the apartment where he had picked them up. [Trial Tr. 36] Ali told them that the fare for the trip was $22.25, but Douglas's girlfriend said they only had $20.00. [Trial Tr. 36] Ali said that was fine, accepted the $20, and drove off. [Trial Tr. 36]

Approximately 45 minutes later, around 3:00 a.m., Ali received another dispatch to the Vista Grande Apartments, but this time it was to Apartment 108. [Trial Tr. 37, 140-41] When Ali arrived, Douglas was waiting for him in the parking lot. [Trial Tr. 38] Since Douglas and his girlfriend had not had the money to pay the full fare earlier that night, Ali asked Douglas if he had enough money to pay him for another trip. [Trial Tr. 38] Douglas said he had the money and asked Ali to take him to an area near the Sullivan Arena to look for his girlfriend. [Trial Tr. 38-39] When they got near the Sullivan Arena, Douglas told Ali to turn onto another street. [Trial Tr. 40-41] Ali became frightened and radioed his dispatcher to report his location. [Trial Tr. 41-42]

According to Ali, Douglas became angry and asked Ali why he was calling his dispatcher.  [Trial Tr. 42]  Douglas then told Ali to take him back to the apartment.  [Trial Tr. 42]  Ali drove Douglas back to the Vista Grande Apartments and told Douglas that the fare was $4.00.  [Trial Tr. 45]  At that point, Douglas put his hand inside his jacket and told Ali to give him all his money or he would kill him.  [Trial Tr. 45]  Fearing that Douglas had a gun, Ali gave him all the money he had – approximately $80.00 to $85.00 – and Douglas then ran into the apartment building.  [Trial Tr. 47]

Ali called 911 from the cab on his cellular phone.  [Trial Tr. 47] Officer James Trull arrived at the scene shortly thereafter and took a statement from Ali.  [Docket No. 54, Tab H, "ER" 69-76; Trial Tr. 146-47]  During the interview, Officer Trull asked Ali if the suspect had threatened him with a weapon.  [ER 72; Trial Tr. 48]  Ali replied, "I did not see any weapon, sir.  When he told me give me your money before I kill you, so I just took out the money." [ER 72; Trial Tr. 48]  Ali later testified that he had not, in fact, seen a weapon and he admitted that he had not told Officer Trull or the 911 operator that Douglas had put his hand inside his jacket as if he had a gun.  [Trial Tr. 49, 91]

When asked by the prosecutor to explain why he had not mentioned this to the police, Ali stated:

Q    Okay.  And I guess the question is:  Why didn't you tell that to Officer Trull when he was first there at the scene?

A    Sir, the question was like:  Did you see any weapon?  So my answer was:  No, I did not see any weapon.  But I thought that he had a gun or something underneath his jacket, and I did not take the chance.  So I thought – you know, money, I don't care about the money, . . .

[Trial Tr.  49]

Defense counsel also pressed Ali for an explanation of why he

had not earlier told this to the police:

Q    On your cell phone call to the police, do you recall the dispatcher asking you two times whether the man had a weapon?

A    I'm not sure about it, sir.  I'm not sure.

Q    Well, if I told you that that tape says that two times, she asked you if he had a weapon, and both times you answered no, is that – is that possible?

A    Yes, sir.  Probably – I mean, I didn't see any weapon, so how do I know? . . .  The thing is, when he put his hand down underneath his jacket, I did not take the chance whether he got any weapon or not.  And I don't want to take the chance, just because the money, you know, for whatever money, $80, $90, whatever.  I just give it to him.

Q    Do you think it was important, that it made a difference whether he might have a weapon or didn't have a weapon?

> A    Yeah, I was scared, because when he put his hand underneath his jacket, I was scared he might have a gun or not, you know.  Maybe or maybe not, you know?  And I don't – I don't want to take the chance, you know, give somebody a chance. . . .

[Trial Tr.  91-92]

After speaking to Ali, Officer Trull went to the Dimond Wal-Mart and verified that Douglas and a female companion had returned a small television set to the store shortly after 2:00 a.m. that morning and had received a $60 refund.  Officer Trull was told that Douglas had identified himself by showing his driver's license and that he had signed a receipt for the refund (which Trull also obtained).    [Trial Tr. 113-19,  150-51]    Based on this information, Officer Trull constructed a photo line-up and showed it to Ali about a week later.  [Trial Tr. 50-51, 152-55]  Ali positively identified Douglas as the man who had robbed him.  [Trial Tr. 50-51, 159]  Douglas was arrested shortly thereafter.  [Trial Tr. 159-60]

Proceedings

*1.    Indictment and Trial*

Douglas was indicted on one count of first-degree robbery.  AS 11.41.500(a).  [ER 3-4]  At trial, Douglas took the stand in his own defense. Douglas testified that he and his girlfriend were addicted to cocaine and that he

was "on a runner" (*i.e.*, using cocaine heavily) at the time of the robbery. [ER 224-26] Douglas admitted that he had never met Ali before and he confirmed Ali's testimony about the cab ride to the Dimond Wal-Mart; Douglas told the jury that he and his girlfriend had returned the television set in order to get money to buy more cocaine. [Trial Tr. 231-35]

Douglas denied robbing Ali and claimed that the entire incident had been a misunderstanding – essentially, a drug deal gone bad. [Trial Tr. 266, 268] Douglas claimed that the conversation had turned to drugs on the ride back from Wal-Mart and that it was *Ali* who had asked Douglas if Douglas could get him some cocaine. [Trial Tr. 241-45] Douglas testified that Ali gave him around $65 to buy some cocaine. [Trial Tr. 248-60] According to Douglas, Ali waited outside in his cab while Douglas tried to contact his dealer, but Douglas was not able to locate any cocaine for several hours. [Trial Tr. 262-264] When Douglas finally came up with the cocaine later that morning, Ali had already left. [Trial Tr. 263-68]

The jury found Douglas guilty of first-degree robbery as charged in the indictment. [ER 326; Trial Tr. 358]

2.    *Post-Conviction Relief Proceedings*

a.    *Judge Andrew's decision*

Prior to the sentencing hearing, Douglas filed a motion for a new trial (which the court treated as an application for post-conviction relief under Alaska Criminal Rule 35.1), alleging that he had received ineffective assistance of counsel at his trial. Douglas alleged that his trial counsel, James Hopper, had been ineffective for (1) failing to properly impeach Ali, (2) failing to adequately investigate the case and discover specific acts of dishonesty in the court records that could have been used to impeach Ali's credibility, and (3) failing to request a lesser-included offense instruction on third-degree theft. [ER 48-68] The state opposed Douglas's application. [ER 206-31] Douglas filed an affidavit in support of his application and later deposed Hopper. [ER 43-45; 235-54] Douglas also submitted a report from attorney John Murtagh in which Murtagh concluded that Hopper had rendered ineffective assistance for the reasons alleged in the application and suggested other areas where Hopper might have been ineffective. [ER 289-305]

An evidentiary hearing was held in March 2001 at which Hopper, Douglas, and Murtagh testified. [Docket No. 54, Tab G, "EH Tr." 362-499] At the conclusion of the hearing, Judge Andrews entered her factual findings on the record and denied Douglas's application for post-conviction relief. [EH Tr. 484-92] Judge Andrews found that Hopper did an adequate investigation of the civil records after Douglas alerted him that Ali may have been involved in several

pending civil suits and, that despite Hopper's best efforts, the civil index did not reveal any information about Ali due to a mistake by Hopper. [EH Tr. 484-85] However, Judge Andrews found that even if Hopper's mistake in researching the civil index was due to incompetence, any information on Ali's involvement in the civil suits would not have significantly contributed to the outcome of Douglas's criminal trial. [EH Tr. 485-89] Judge Andrews further found that Ali's testimony from the civil trial at most amounted to specific acts of dishonesty for which he was not convicted and which were only tangentially related in subject and time. [EH Tr. 486-88] Therefore, Judge Andrews found it unlikely that the testimony would even have been admissible. [EH Tr. 486-88]

As to Douglas's claims that Hopper failed to advise him about the lesser-included offense of theft, Judge Andrews found that this issue came down to a credibility issue between Hopper and Douglas and found that Hopper's testimony that Douglas insisted on an all-or-nothing defense more credible. [EH Tr. 490-92] Finally, Judge Andrews found Hopper's decision not to impeach Ali with the audiotapes of the 911 call or the police interview was a clear tactical choice by Hopper. [EH Tr. 492]

Douglas appealed Judge Andrew's decision to the Alaska Court of Appeals.

b. *Alaska Court of Appeals decision*

The Alaska Court of Appeals affirmed Judge Andrews' findings in all respects. *Douglas v. State*, Mem. Op. & J. No. 4718 (Alaska App. June 11, 2003). On the issue of Hopper's failure to find the records of Ali's involvement in multiple civil suits, the court of appeals held that Douglas was not harmed by Hopper's failure to find the records of Ali's civil cases because that evidence would likely not have been admissible. *Id*. at 5. The court held that, even if Ali acted with the intent to deceive the government by underreporting his income and claiming his stepson on his tax returns, "a litigant is generally not allowed to attack a witness's truthfulness by introducing evidence of a witness's collateral acts of dishonesty." *Id*. The court elaborated further by stating usually only opinion or reputation evidence is admissible evidence of a witness's dishonesty, with the exception of crimes of dishonesty or false statement within the preceding five years. *Id*. Ultimately, regardless of whether Hopper was incompetent in failing to find the records of Ali's civil cases, the court agreed with Judge Andrews that the civil records were irrelevant and would not have affected the outcome of Douglas's criminal trial. *Id*. at 6.

The court held that Judge Andrew's finding that Hopper's decision not to impeach Ali with the audiotapes of Ali's 911 call or his interview with the police was a reasonable strategic decision was amply supported by the record. *Douglas*, mem. op. at 8. As to Douglas's claim that Hopper failed to advise him

of the lesser-included offense of theft to the robbery charge, the court first found that Douglas's version of events did not amount to the lesser-included offense of theft but to a separate charge of theft. *Id.* The court went on to hold that Judge Andrew was not clearly erroneous in finding credible Hopper's testimony that, although Hopper had discussed the lesser-included offense of theft with Douglas on several of occasions, Douglas had adamantly adhered to an all-or-nothing defense. *Id.* at 9.

On appeal, Douglas also argued that he should have received a new trial due to prosecutorial misconduct. *Douglas*, mem. op. at 10. Since Douglas failed to make any arguments regarding prosecutorial misconduct before the superior court, the court of appeals held that Douglas was required to show that the alleged misconduct resulted in plain error. *Id.* Douglas argued that the prosecutor in closing argument had improperly vouched for Ali's credibility, argued that Douglas committed the robbery to get money for drugs, made comments for which no evidence was presented, and argued from personal knowledge. *Id.* at 10-15. The court found that all of these claims of prosecutorial misconduct were without merit. *Id.* Douglas filed a petition for hearing with the Alaska Supreme Court seeking review of the court of appeal's decision but the petition was denied. [State's Attachment 3]

This petition for writ of *habeas corpus* followed.

Douglas v. Hyden, 3:03-cv-0221-JWS-JDR
Page 11

<u>ARGUMENT</u>

I.      THE HABEAS CORPUS STANDARD

The applicable standard for a writ of habeas corpus is set forth in 28 U.S.C. § 2254(d).  Under this statute, a habeas application must be denied unless the state court's handling of a claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Douglas has failed to meet his burden of showing that the decision of the Alaska Court of Appeals involves an unreasonable application of clearly established federal law or is based on an unreasonable determination of the facts.  As will be shown below, the court of appeals' decision follows federal law for all of Douglas's ineffective-assistance-of-counsel claims and prosecutorial misconduct claims and is based on a reasonable determination of the facts.

II.     APPLICABLE LAW ON INEEFECTIVE ASSISTANCE OF COUNSEL.

The right to effective assistance of counsel is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article I, section 11 of the Alaska Constitution.  Alaska has developed a

Douglas v. Hyden, 3:03-cv-0221-JWS-JDR
Page 13

two-pronged test, the "*Risher* test," for determining the adequacy of representation in a criminal case. Under this test, an applicant has to show both that his former attorney's performance fell below the *minimum* level of competency, *i.e.*, the attorney took actions or made omissions that no reasonably competent attorney would have taken or made, and that he was prejudiced as a result of his attorney's incompetence (that is, that the lack of competency possibly contributed to the applicant's conviction). *Risher v. State*, 523 P.2d 421, 424-25 (Alaska 1974).

Alaska's test is very similar to the *Strickland* test, the test used to evaluate claims of ineffective assistance under the federal constitution. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The competency prong of both tests are essentially the same; the prejudice prong of the Alaska test, however, is less demanding (or is more favorable to the defendant). *See, e.g., State v. Steffensen*, 902 P.2d 340, 342 (Alaska App. 1995) (*Strickland* test requires a reasonable *probability* that outcome would have been different, while *Risher* test requires only a reasonable *possibility* that outcome would have been different). Nonetheless, even though Alaska law and federal law are virtually the same, under federal law there is a presumption that state courts know and follow federal law. *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 360 (2002). Where a state court's application of federal law is

challenged, the party challenging the application must show that the application was not only erroneous but objectively unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S.Ct. 1, 5 (2003).

"Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. If it appears that counsel's actions were done for tactical reasons, then they will be virtually immune from subsequent challenge, even if in hindsight the tactic appears to have been mistaken. *Wiggins v. Smith*, 539 U.S. 510, 522, 123 S.Ct. 2527, 2535 (2003). When a tactical choice has in fact been made, even if it was made by an attorney who was not fully informed as to available options, the choice will be subject to challenge only if the tactic itself is shown to be unreasonable. *Strickland*, 466 U.S. at 689-91, 104 S.Ct. at 2065-66. When a defendant cannot rule out the possibility that his counsel had a sound tactical reason for the action or omission, the presumption of competence is unrebutted and precludes a finding of ineffective assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065-66*; see also Darden v. Wainright*, 477 U.S. 168 at 186-87, 186 S.Ct. 2464 at 2474 (1986) (holding petitioner had not overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy). To overcome the presumption of competency, a

defendant is required to present "evidence ruling out the possibility of a tactical reason to explain counsel's conduct." *Massaro v. United States*, 538 U.S. 500, 505, 123 S.Ct. 1690, 1694 (2003).

Furthermore, because the constitutional guarantee of effective assistance does not require error-free representation, it is not enough to prove that counsel made a mistake. *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066-67. "Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. at 8, 124 S.Ct. at 9. Moreover, "under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995). "An error by counsel, even if unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

"It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693, 104 S.Ct.

at 2067.  In order to show prejudice, a defendant must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 2068.  The United States Supreme Court has defined reasonable probability to mean "a probability sufficient to undermine confidence in the outcome." *Id.*  Like the assignment of the burden of proof on competency, *Strickland* assigns the burden of proof on prejudice to the accused, who must show that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 2068-69.

    III.    THE ALASKA COURT OF APPEALS' DECISION THAT DOUGLAS RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL IS REASONABLE.

    A.    <u>Hopper conducted a reasonable investigation of the civil records.</u>

Douglas argues that his trial counsel, Hopper, was ineffective for failing to discover court records that he asserts could have been used to impeach Ali at trial.  [Petitioner's Br. at 11]    However, Douglas fails to show that the Alaska Court of Appeals applied the *Strickland* rule in an objectively unreasonable manner.  Generally, the court records consisted of various civil pleadings and other documents showing that Ali had been involved, as both a plaintiff and a defendant, in lawsuits seeking money damages for injuries

suffered in automobile accidents and as a plaintiff in a number of forcible entry and detainer actions.2  [ER 77-200]  Douglas asserts that Hopper would have found a deposition in one of the civil lawsuits in which Ali acknowledged that he had underreported his income and improperly claimed his stepson as a dependant in his tax returns for 1994 and 1995.  [Petitioner's Br. at 12]

The court of appeals held that even if it proceeded on the assumption that Ali intended to deceive the government when he underreported his income and wrongly claimed a dependant, the Alaska Rules of Evidence do not allow the impeachment of a witness by collateral acts of dishonesty unless it resulted in a conviction for dishonesty in the preceding five years. *Douglas v. State*, Mem. Op. & J. No. 4718 at 5 (Alaska App. June 11, 2003). *See also* Alaska R. of Evid. 608 & 609.  Further, the court of appeals agreed with Judge Andrews that the information Douglas claims Hopper could have found in the civil records regarding Ali's lawsuits against the tenants of his rental properties would not have been relevant in Douglas's criminal proceeding. *Douglas*, mem. op. at 5.

Douglas makes no argument that the court of appeals misapplied federal law or applied federal law in an objectively unreasonable manner.  Under

---

2    These records apparently came to light when Murtagh ran Ali's name through the computerized records in the Anchorage courthouse. [ER 294; EH Tr. 366, 382]

*Strickland*, the United States Supreme Court stated that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2070. Here, the court of appeals and Judge Andrews determined that, even if Hopper had found the information Douglas is arguing a reasonably competent attorney would have found, the information would have been inadmissible and irrelevant. It was reasonable for the court of appeals and Judge Andrews to hold that the specific acts of Ali's underreporting of income and wrongly claiming of a dependant on his tax return would not have been admissible because the Alaska Rules of Evidence only allow impeachment for specific acts of dishonesty if the witness was criminally convicted for those acts in the preceding five years. Alaska R. of Evid. 509. Douglas has presented no evidence that Ali was convicted of any crimes of dishonesty in the preceding five years.

Douglas offers no explanation for why information about lawsuits involving Ali's rental properties would have been relevant or how the court of appeals' holding that this information is irrelevant is an objectively unreasonable application of law. Douglas provides no legal support for his argument that the alleged specific acts of dishonesty committed by Ali would have been admissible and relevant, including entering into a fraudulent

marriage, stealing his stepson's money, lying about providing financial support, fraudulent claims of injury, and lying in government documents.  Douglas offers no evidence that Ali has criminal convictions for any of these specific acts, nor does he offer any legal support for his conclusory statement that "[t]he state courts were wrong."  [Petitioner's Br. at 14]

Douglas attempts to argue that if Hopper had adequately investigated the civil court records, Hopper would have found witnesses that would have testified to Ali's general lack of credibility and "had the government or Ali opened the door," all of this evidence of specific acts could have been introduced.  [Petitioner's Br. at 15]  However, as stated above, "an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995).  All of Douglas's arguments about what Hopper should have found are based on the benefit of hindsight and what Douglas knows now, after the trial is over and having the benefit of hearing the state's case.  Douglas now knows that the prosecutor's opening and closing argument characterizing Ali as a "simple guy" who had a family and was in the Army Reserves.  Moreover, Douglas offers no evidence that "the government or Ali opened the door"; Douglas only offers the vague hope that one of them could have opened the door but they did not.  [Petitioner's Br. at 15]  Nowhere in Douglas's opening brief is

there any basis for an argument that the court of appeals applied the *Srickland* standard in an objectively unreasonable manner.

The record reflects that Hopper acted as a reasonably competent attorney. Hopper's failure to find the court records did not amount to ineffective assistance of counsel. As discussed above, "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 9 (2003). In rejecting Douglas's claim, Judge Andrews concluded that Hopper probably did *more* than most competent attorneys would have done by searching the court records in the first place and that he simply made a mistake in entering Ali's name into the computer. [EH Tr. 484-85]  Douglas criticizes Judge Andrews' finding but offers no argument as to what he thinks a competent attorney would have done or why Judge Andrews was incorrect in finding that Hopper went above and beyond the normal practice. Douglas then incorrectly asserts that Hopper's unsuccessful attempt to search the civil court records "were neither documented nor verifiable," [Petitioner's Br. at 13] even though it is clear from Hopper's case notes and Murtagh's expert report that Hopper documented his attempts to search the court's computer records in his case notes. [ER 294, 305]

Furthermore, Hopper testified that he ran Ali's name through the system several times with different spellings. [Docket No. 54, Tab F at 6-7; EH

Tr. 428] Even Murtagh agreed that Hopper made a good-faith effort to search the court records. [EH Tr. 382] Douglas's only argument in response to this evidence is that Hopper was either untruthful or incapable [Petitioner's Brief at 13] but this argument ignores the fact that Judge Andrews found Hopper to be truthful. It should be noted that Douglas's counsel even acknowledges confusion about the spelling of Ali's name and states that his "first name was not always consistently spelled." [Petitioner's Br. at 7 n.3] In short, Hopper's failure to find the records was not indicative of incompetence; it was simply a mistake that any competent attorney could have made. *See Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066 (1984) (counsel is ineffective when he or she acts "outside the wide range of professionally competent assistance").

B.    This court should not expand the evidentiary record.

Douglas argues that this court should expand the record in this case. Expanding the record in this case is unnecessary because much of the evidence that Douglas wants this court to consider was already considered by the state court in the post-conviction relief evidentiary hearing and because the evidence Douglas is attempting to enter is all evidence advanced with a strategic perspective in hindsight. The standard for expanding the record in a *habeas* case is very difficult to meet. In order to expand the evidentiary record, Douglas must show "cause for his failure to develop the facts in state-court proceedings

and actual prejudice resulting from that failure or, alternatively, that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing." *Brown v. Easter*, 68 F.3d 1209, 1211 n.1 (9th Cir. 1995) (internal quotations marks omitted).

Douglas does not even make an argument that he meets the standard stated above. As previously discussed, Judge Andrews received evidence in a post-conviction relief evidentiary hearing and in fact considered many of the issues that Douglas lists in his brief as issues this court should consider hearing new evidence on. [Petitioner's Br. at 16] At the evidentiary hearing, Douglas, Hopper and John Murtagh, a stipulated expert on criminal legal defense, testified. [EH Tr. 365, 406] Murtagh testified to running Ali's name in the court database and stated that the most significant thing in the court files was the deposition in which Ali admitted to underreporting his income and falsely claiming a dependant on his tax return. [EH Tr. 365-67] With regards to whether Hopper did a reasonable investigation, all of Murtagh's testimony focused on the issue of Ali's income tax admissions. [EH Tr. 365-67, 382-385] Now Douglas's third attorney has come up with yet more ideas of trial strategies that might have worked to discredit Ali based on investigation of the civil records, but Douglas has failed to show cause for his failure to develop these facts at the state evidentiary hearing. Douglas is also unable to show prejudice

or that a miscarriage of justice would result if he is not given an evidentiary hearing as discussed above. Therefore, this court should deny Douglas's request to expand the evidentiary record.

C.      Hopper's decision not to play the audiotapes was a strategic decision and should be immune from Douglas's challenge.

Douglas argues that Hopper failed to introduce evidence of Ali's prior inconsistent statements. [Petitioner's Br. at 16]  He asserts that Hopper should have played the tapes of Ali's 911 call and his interview with Officer Trull to impeach Ali's testimony that he thought Douglas had a weapon under his jacket. [Petitioner's Br. at 18]  The court of appeals held that "Judge Andrews found that the trial attorney made a reasonable tactical decision not to introduce the tapes.  The judge's finding is amply supported by the record." *Douglas v. State*, Mem. Op. & J. No. 4718 at 8 (Alaska App. June 11, 2003).  There is no indication that the court of appeals applied the law in an objectively unreasonable manner in affirming Judge Andrews' decision.

Under the *Strickland* standard, "strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S.Ct. 2052, 2066 (1984).  Judge Andrews found that Hopper made a strategic decision not to use the 911 tape and the interview tape. [EH Tr. 492]  That

finding is supported by the record and the law.  Hopper testified that he decided

not to use the tapes in the manner suggested by Douglas because Hopper was

satisfied that Ali had made a poor impression on the jury and that he did not

want to give him any chance to recover or rehabilitate himself by playing the

tapes:

> At the time I did the cross-examination of Mr. Ali, I –
> certainly, I considered it [using the interview tape].  And I –
> as the cross-examination developed, I chose not to do it.  I
> mean, I was satisfied with his answers to my questions, and I
> was satisfied with what I perceived was the impression he
> was giving to the jury.
>
> * * * *
>
> At the time – and I had the [911] tape and I had the
> tape player just for that purpose.  But again, based on his
> answers to my cross-examination and what I perceived the
> impression he was giving the jury, I chose not to do that.

[EH Tr. 430-32]

> My impression. . . I mean, his body language and
> everything was just – you know, when he would say: I don't
> remember; or when he would come out with an answer like:
> The officer didn't ask me the right question – I mean the guy
> was squirming.
>
> * * * *
>
> And he was perfect.  I mean, he was squirming around;
> he wouldn't look at me.  He wouldn't look over there at all, at
> the jury.  No, I mean, the guy was – I was happy with what he
> was doing.

\* \* \* \*

> I didn't want to come up here to him and give him the opportunity to calm down. I didn't want to give him that break. . . . He was squirming, and I wanted him to stay that way.

[EH Tr. 438-40]  Hopper also testified that Ali sounded like a robbery victim on the 911 tape, that he did not want the jury to hear the tape for that reason, and that he thought there was nothing to gain by playing the tape given Ali's "reaction to the cross-examination."  [EH Tr. 442]

Douglas fails to argue that the court of appeals applied the law in an objectively unreasonable manner.  Douglas makes the conclusory statement that "[t]here was no strategic advantage to Hopper's failure to play the tape." [Petitioner's Br. at 21]  Douglas then goes on to argue that, since there were "no screams, no crying, no gory details, in fact nothing on the tape that would have worked to Douglas's disadvantage," then there must have been no strategic reason for not playing the tapes.  [Petitioner's Br. at 21]  However, as shown by the excerpt of the transcript above, Hopper did have strategic reasons for not playing the tapes: he believed that his cross-examination of Ali sufficiently undermined Ali's credibility and that playing the tape might only bolster Ali's credibility and give Ali time to compose himself on the stand.

Instead of arguing that Hopper had no strategic reasons for not introducing the audiotapes, Douglas tries to show how he was prejudiced by Hopper's failure to play the tapes. [Petitioner's Br. at 22-24] But Douglas was not prejudiced by Hopper's cross-examination of Ali because the cross-examination was lengthy and thorough and Hopper probably accomplished as much as he could have hoped for in terms of impeaching Ali's account of the robbery. [Trial Tr. 51-108] For instance, Hopper got Ali to admit that he had first mentioned the possibility of Douglas having a weapon just prior to testifying before the grand jury (more than two months after the robbery), that he had not told the police that he thought Douglas might have had a weapon because they did not ask him the right questions, and that he had made numerous inconsistent statements about the details of the robbery. [Trial Tr. 52-58, 62-65, 78-84, 88-94, 103-04] Hopper also got Ali to admit that he had applied to be a police officer with the Anchorage Police Department and that he had told Officer Trull that he was going to take the written test in a few days. [Trial Tr. 104-05]

Douglas has failed to rebut the strong presumption that Hopper had a strategic reason for not playing the 911 and police interview tapes for the jury. As is shown by the excerpt of Hopper's deposition and Hopper's testimony at the evidentiary hearing, Hopper had strategic reasons for choosing not to play the

audiotapes. Douglas has not shown that the court of appeals applied the law in an objectively unreasonable manner when it affirmed Judge Andrew's decision that Hopper's strategic decision fell within the spectrum of reasonable competence of counsel.

 D. <u>Hopper's decision not to request theft as a lesser-included offense was a strategic decision and should also be immune from Douglas's challenge.</u>

 Douglas argues that Hopper was ineffective for failing to request an instruction on theft as a lesser-included offense of robbery. [Petitioner's Br. at 24] Douglas's entire defense at trial was that Ali willingly gave him the money so that Douglas could buy Ali crack but Ali grew impatient and, only after Ali left, did Douglas embezzle the money for his own use. The court of appeals held that Douglas's version of events was not a lesser-included offense of theft but a separate offense of theft that would have occurred after the robbery. *Douglas v. State*, Mem. Op. & J. No. 4718 at 8 (Alaska App. June 11, 2003). Douglas fails to show that the court of appeals applied the law in an objectively unreasonable manner.

 Although Douglas now argues that "[a]n instruction of theft would have been supported by the testimony given," Douglas's testimony at trial was that he did not intend to embezzle Ali's money until several hours after Ali had handed the money over to Douglas in the cab. [Trial Tr. 263-67] Douglas did not

argue to the jury, for instance, that if the jury found Douglas did not have a gun and did not try to take Ali's money by force, the jury should find him guilty of theft because he stole Ali's $80 in the cab but he did not use force or threat of force to steal it.  Douglas instead argued that he did not have the intent to steal money *at all* when Ali gave it to him in the cab; he did not have the intent to steal the money until a much later time. The court of appeals held this was not a lesser-included offense.  Therefore, Douglas was not prejudiced by Hopper's failure to ask for jury instructions on theft because he was not entitled to it based on his version of the facts.

Even if Douglas was entitled to a jury instruction on theft as a lesser-included offense based on his version of the facts, Douglas failed to overcome the presumption that it was a strategic decision not to ask for the jury instruction.  Hopper's decision not to ask for jury instructions on the lesser-included offense of theft was a strategic decision made because Douglas wanted to proceed on the "all or nothing" defense and because Hopper reasonably thought that a theft instruction would be inconsistent with Douglas's version of the facts.  Hopper testified that he and Douglas had discussed the issue of a possible lesser-included offense instruction at great length. [EH Tr. 408-19, 432-38; Docket No. 54, Tab F 27-31, 41-42, 55]  Douglas argues that "Hopper, in his testimonies [*sic*], conceded that he thought the failure to request a lesser-

included instruction would be detrimental to Douglas." [Petitioner's Br. at 28] That is not accurate.

According to Hopper, they decided not to request the instruction because Douglas was adamant about mounting an all-or-nothing defense to the robbery charge, *and* Hopper believed that the instruction would have been inconsistent with Douglas's testimony that Ali had given him the money as part of the drug transaction. [ER 242-45, 247-48, 250-52; EH Tr. 408-19, 432-38; Docket No. 54, Tab F 27-31, 41-42, 55] Although Douglas argues that the decision of whether to ask for jury instructions on the lesser-included offense was for counsel to make and not for Douglas to make, federal courts have upheld an attorney's decision to acquiesce to a defendant's wish as to how to proceed at trial. *See, e.g., Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993) (holding that "when a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made") (quoting *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985)). Furthermore, as stated above, regardless of Douglas's reasons for not wanting the lesser-included offense jury instruction, Hopper had his own professional strategic reason for deciding not to ask for the jury instructions.

Douglas testified that Hopper was lying, that Hopper had never discussed lesser-included offenses with him, and that he had not told Hopper

that he did not want a lesser-included instruction. [EH Tr. 462-64] In rejecting this claim, Judge Andrews found that Hopper was more credible than Douglas and concluded that the decision not to request a lesser-included offense instruction did not amount to ineffective assistance. [EH Tr. 489-92] The court of appeals reviewed the record on appeal and found that Judge Andrews's resolution of the conflicting testimony was not clearly erroneous. *Douglas*, mem. op. at 8.

It is well within the spectrum of reasonable competence of counsel for Hopper to have decided on an "all or nothing" defense. Defense attorneys and defendants routinely choose to forgo lesser-included offense instructions in order to avoid making inconsistent arguments and in hopes of being acquitted altogether. Such choices are frequently recognized as reasonable trial tactics. *See United States v. Thompson*, No. CIV.A. 98-3256-GTV, 1999 WL 615889, at *3 (D. Kan. July 15, 1999) (defense counsel strategically chose to avoid lesser-included offense instruction because there was a maximum two-year sentence for that offense, so counsel proceeded on an "all or nothing" defense). *See also Jackson v. State*, 750 P.2d 821, 826-27 (Alaska App. 1988) (attorney's decision not to request manslaughter instruction upheld as a reasonable tactical choice, where attorney believed that jury might convict defendant of lesser offense rather than totally acquitting him of murder charge); *State v. Kimbrough*, 630

N.W.2d 752, 760 (Wis. App. 2001) (finding that counsel's failure to ask for lesser-included offense instruction was deliberate and "that defense counsel's actual representation was well within the range of objectively reasonable representation under all the circumstances").  Moreover, it is the trial court's responsibility to resolve testimonial disputes and make credibility determinations.  *Lott v. State*, 836 P.2d 371, 377 n.5 (Alaska App. 1992).  Here, Judge Andrews expressly found Hopper's testimony that he made a tactical decision not to request the instruction to be more credible than Douglas's testimony that the issue was never discussed at all.  [EH Tr. 490]

Last, it should be noted that if, in his petition for writ of *habeas corpus*, Douglas is arguing that he had the intent to steal the money at the time he took it from Ali in the cab but he did not use force or threat of force, then this version is a new argument and completely inconsistent with Douglas's testimony at trial and throughout his appeal.  *Douglas v. State*, Mem. Op. & J. No. 4718 at 8 (Alaska App. June 11, 2003).  [Trial Tr. 263-67]  Douglas never argued at trial, during his post-conviction-relief proceedings, or before the court of appeals that he stole the money from Ali but he did not take by the money by force or threat of force.  Douglas's sole defense throughout these proceedings has always been that he did not intend to steal the money when Ali gave it to him in the cab; he intended to buy crack cocaine with the money that he would share with Ali, it

was only later in time that his intent changed. Therefore, any theory that he intended to steal the money at the time he came into possession of it in the cab but not by force or threat of force cannot be basis for relief in the present petition because Douglas will not have satisfied the exhaustion doctrine with respect to this claim and this court would be forced to dismiss the petition. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490, 93 S.Ct. 1123, 1127 (1973).

Douglas received effective assistance of counsel at trial. Accordingly, the court of appeals did not apply the law in an objectively unreasonable manner in affirming Judge Andrews' decision denying Douglas's application for post-conviction relief.

IV.     THE PROSECUTOR'S FINAL ARGUMENTS WERE PROPER AND DID NOT CONSTITUTE PLAIN ERROR

A.     Douglas did not argue in the state proceedings that Hopper's failure to object to the prosecutor's comments amounted to ineffective assistance of counsel.

In Douglas's opening brief in support of his petition for *habeas corpus*, he argues that he "framed the failure to object as one of many bases for finding his counsel ineffective." [Petitioner's Br. at 33] This is not so. Before the court of appeals, Douglas argued that the prosecutor's comments violated his right to due process. [State's Attachment 1 at 62] Nowhere in his briefing to the

Douglas v. Hyden, 3:03-cv-0221-JWS-JDR
Page 33

court of appeals did Douglas analyze the prosecutor's comments under the *Strickland* or *Risher* ineffective-assistance-of-counsel tests. The only time that Douglas mentioned that Hopper failed to object was when stating that since Hopper failed to object, Douglas acknowledged that he had to show plain error. [State's Attachment 1 at 59]

The fact that Douglas did not raise the prosecutor's comments in the context of an ineffective-assistance-of-counsel claim is reinforced by the court of appeals' opinion. The court of appeals only analyzed Douglas's argument as a due process argument and never mentioned the possibility that Douglas raised the claim as an ineffective-assistance-of-counsel claim, because it was not framed as such in his brief. *Douglas v. State*, Mem. Op. & J. No. 4718 at 10-15 (Alaska App. June 11, 2003). Douglas cannot raise this argument for the first time in his petition for *habeas corpus* because he has not satisfied the exhaustion doctrine with respect to this claim and this court should dismiss his petition based on this new claim of ineffective assistance of counsel. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490, 93 S.Ct. 1123, 1127 (1973).

B.    The court of appeals was not unreasonable in holding that the prosecutor's closing argument did not prejudice Douglas.

Douglas argues that the prosecutor unfairly vouched for Ali's credibility, the prosecutor wrongly disparaged the defendant and the defense,

the prosecutor wrongly commented on his personal knowledge about drug deals, and wrongly argued facts during closing argument that were not in evidence. [Petitioner's Br. at 32-39]  According to the United States Supreme Court "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471 (1986) (internal quotations omitted).  "In other words, under *Darden,* the first issue is whether the prosecutor's remarks were improper and, if so, whether they infected the trial with unfairness." *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

Douglas argues that the prosecutor improperly vouched for Ali's credibility by comparing Ali's and Douglas's backgrounds, citing Ali's membership in the Army Reserves, suggesting that the Army Reserves would not tolerate someone who smoked cocaine, and by stating that jury could conclude that Ali was more believable than Douglas and was "perfectly innocent." [Petitioner's Br. at 35-37]  As mentioned above, the court of appeals found that, since Douglas failed to raise these objections at trial, Douglas had to show plain error.  *Douglas v. State*, Mem. Op. & J.  No. 4718 at 10 (Alaska App. June 11, 2003).  The court of appeals stated that it was improper for a prosecutor to assert a personal belief as to a witness's truthfulness or untruthfulness.  *Id*. at

11.   However, the court stated that the reason for this rule is to prevent attorneys from giving unsworn testimony by asserting that they have personal knowledge of the witness's credibility. *Id*. at 11.  The court of appeals held that the prosecutor in Douglas's case did not implicitly or explicitly claim to have personal knowledge of Ali's trustworthiness and was only making inferences from evidence admitted at trial. *Id*.  Therefore, the court of appeals held that the prosecutor did not improperly vouch for Ali's credibility.

Under federal law, "[a] prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by . . . imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted." *United States v. Perez-Ruiz*, 353 F.3d 1, 9 (1st Cir. 2003).  Generally, "arguing why a witness should be believed or asking jurors to use their common sense in assessing witness testimony is not vouching." *United States v. Isler*, 429 F.3d 19, 28 (1st Cir. 2005).  All of the federal cases that Douglas cites as authority for improper vouching involve cases in which a prosecutor places the prestige of the government behind the witnesses by arguing in some form or another that the government can be trusted. *See United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) (holding that the prosecutor's comment *"Is Special Agent Reyes lying?* Did he get up on the stand under oath and lie to you

for the sole purpose of convicting an innocent man? *It's unbelievable*" was not improper but comment that nine other officers that did not testify agreed with Reyes was improper) (emphasis in original).  *See also United States v. Combs*, 379 F.3d 564, 574 (9th Cir. 2004) (holding that it was impermissible vouching for the prosecutor to argue that "the jury had to believe that [Drug Enforcement Administration special] agent Bailey risked losing his job by lying on the stand."); *United States* v. *Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (finding improper vouching when the prosecutor stated in closing argument "what you need to believe, ladies and gentlemen, in this little case that the reputation of the [D]epartment of [J]ustice would be put on the line to solicit false testimony just to prove up a case against these two defendants").

The federal case law shows that a prosecutor puts the prestige of the government behind a witness not merely by generally talking about the witness in closing argument and because the prosecutor is a representative of the state. The prosecutor puts the prestige of the government behind a witness by making specific comments that the witness should be believed because the government stands behind the witness's testimony and there is some sort of repercussion if he were to lie, *i.e.*, he works for the government and his job would be in jeopardy if he were to lie or the government's reputation is on the line if the witness were to lie.

Douglas v. Hyden, 3:03-cv-0221-JWS-JDR
Page 37

That is not what happened in the present case.  The prosecutor did compare the backgrounds of Douglas and Ali but these comparisons were based on the evidence presented during the trial and were not improper.  Both Douglas and his girlfriend testified at length that they were addicted to cocaine and that their drug problems had resulted in the loss of their children, their home, and their employment.  [Trial Tr. 176-77, 180, 187-89, 194-96, 223-27, 231-32, 243] Douglas also testified that he was in jail and that he had been convicted of other crimes. [Trial Tr. 270-79] Douglas testified extensively about the "drug scene" and his involvement with drugs.  [Trial Tr. 229-231, 242-44, 279-82, 287-88] Ali testified that he had come to Alaska in 1994 (after coming to the United States from Bangladesh in 1991), that he was married and had one child, that he was in the Army Reserves and going to school to obtain a degree in computer science, and that he drove a cab part-time to support his family.  [Trial Tr. 24-28]

During his final argument, the prosecutor referred to the testimony of Douglas and his girlfriend to illustrate the lengths that a person who is addicted to cocaine will go to obtain the drug.  [Trial Tr. 342-43]  In contrast, the prosecutor characterized Ali as a hard-working man who was going to school part-time and driving a cab to provide for his family.  [Trial Tr. 322-23, 353-54] These were proper comments on the evidence. The prosecutor's closing argument was an accurate description of both Douglas and his girlfriend according to their

own testimony.  It is unlikely that the jury viewed the unfavorable description of Douglas any differently than Douglas's own testimony acknowledging that his drug use has caused significant problems in his life.

It is improper for a prosecutor to express his personal belief as to the credibility of a witness.  But here the court of appeals properly found that the prosecutor's characterization of Ali was similarly a proper inference that could be drawn from the evidence.  The characterization did not rely on personal belief and knowledge or any other information extrinsic to the evidence. Even if the comments were improper, they were not obviously erroneous or substantially prejudicial.  The court of appeals properly did not apply the law on improper vouching in an unreasonable manner.

It should be noted that Douglas argues that "[t]he prosecutor improperly impugned the defense attorney, calling the defense 'repulsive'." [Petitioner's Brief at 36]  However, the prosecutor did not call the defense attorney repulsive, he called Douglas's bragging that he was such a good drug user and that he smoked crack cocaine in such high volume that he could get $200 worth of crack cocaine for $100 repulsive.  [Trial Tr. 351-52]   The prosecutor was explaining Douglas's theory of the case and why Douglas's theory did not comport with common sense.

Douglas argues that the prosecutor improperly commented on his

own personal knowledge of drug deals and asserted that, based on his personal knowledge, Douglas's version of what happened was not credible. [Petitioner's Br. 37-38] This claim is without merit. The court of appeals held that the prosecutor's argument did not rest on the prosecutor's personal knowledge, it rested on asking the jurors to draw on their common sense as to whether drug dealers normally sell their drugs at a 50-percent discount. *Douglas v. State*, Mem. Op. & J. No. 4718 at 15 (Alaska App. June 11, 2003).

During his cross-examination of Douglas and Douglas's girlfriend, the prosecutor and both Douglas and his girlfriend used street terminology at various times to describe the couple's drug activities – *e.g.*, "chasing the demon" or "chasing the ghost," "giving chips off your rock," "cooking it up," "pushing your pipe," "going on runners," "eight-ball," a "double" or "two rocks," "splitting a half," "tweaking," getting "sold a peanut," and the "dope man." [Trial Tr. 195-98, 201-02, 205, 225, 231, 242-45, 262-63, 280, 286-88]

During his final argument, the prosecutor stated:

> Drugs are part of this – part of our community. Nobody's condoning that, but people usually know a little bit about it. They hear about it, and they see, through their own experiences or friends or family, or somebody has had some experience – they've heard a little about some of this stuff. *And I know a lot about it, because I used to prosecute drug cases. So I – you know,* (indiscernible – away from the microphone) *terminologies and terms I used.*

[Trial Tr. 316-17 (emphasis supplied)]  There was nothing improper about this argument.  The prosecutor was merely explaining that he was familiar with the terminology being used in the courtroom because he had some experience with drug cases.  His comment did not suggest that he had any special knowledge about Douglas's case or that the jury should rely on his expertise in deciding the case.

The prosecutor continued and argued that Douglas's version of the incident did not make sense:

> And one of the things that really struck me was – in Mr. Douglas's statement that just didn't make any sense was, he kept talking about and bragging about how he could make this deal.  He could get $200 worth of cocaine for $100.
>
> Now, you don't get those kind of deals in pretty much any situation in your life.  And if you think about it, you're never going to get those deals if you're buying drugs.  I mean, we're talking about – we're talking about people who are so desperate for money that they're going to cheat the cab driver out of [four] bucks of his fare just so they can keep their entire $40.  They go out at 2:00 o'clock in the morning to return a $60 TV, have to pay a $20 cab fare, just so they can get 40 bucks to get a few hits of crack cocaine.
>
> Drugs are about money.  That's why there's so much violence around it.  Money and the greed for it always incites violence.  And so the dealers know this.  Dealers are salespeople.  They know that people like Mr. Douglas are going to be desperate for this.  And they can keep getting money.  They've got the greed.  They have no reason to give him any kind of charity.  And there isn't a dealer on that

> street that is going to give you $200 worth of crack cocaine for 100 bucks. Why? It doesn't make any sense.

[Trial Tr. 316-18]

Again, there was nothing improper about this argument. The prosecutor was simply suggesting that Douglas's version of the incident did not make sense because it was unlikely that a drug dealer would give a person as desperate and strung out as Douglas had made himself out to be double the quantity of cocaine that he and his girlfriend were able to pay for. This was nothing more than telling the jury to rely on their common sense in evaluating Douglas's testimony. As stated above, "asking jurors to use their common sense in assessing witness testimony is not vouching." *United States v. Isler*, 429 F.3d 19, 28 (1st Cir. 2005). The court of appeals holding was a reasonable application of federal law.

Last, Douglas asserts that the prosecutor wrongly commented on Ali's vulnerability as a cab driver and newspaper articles involving crimes on other taxicab drivers on which no evidence was presented. [Petitioner's Br. at 38-39] The court of appeals held that, although these statements could be construed as improper bolstering of Ali's testimony because it showed that he believed he might be in danger, there was no realistic possibility that Douglas suffered prejudice arising from these statements. *Douglas*, mem. op. at 13.

The court of appeals reasoned that, first, the jury was instructed that counsels' arguments were not evidence and could not be treated as such. *Douglas*, mem. op. at 13. Second, there was no issue at trial as to whether Ali's fear was reasonable or not. Furthermore, the comments that Douglas is complaining of are only brief statements made in the prosecutor's closing arguments. [EH Tr. 322, 309-325, 345, 342-54] The comments were passing comments and could only have had minimal, if any, effect on the jury. [EH Tr. 322] Also, Douglas's defense mainly rested on Douglas's own credibility and the jury believing Douglas's version of the facts, not on disproving Ali's version of facts. Douglas's defense was that Douglas did not take Ali's money from him unwillingly. There are a variety of reasons that jury could have found Douglas to be not credible, including that he had been convicted of five crimes of dishonesty and an admitted cocaine addict, who, was looking for more money to buy drugs with that night. [Trial Tr. 224-26,231, 247, 258, 274-75] The court of appeals did not apply the law unreasonably and this court should uphold its decision.

In short, none of the arguments Douglas challenges by his petition for writ of *habeas corpus* were improper. Even if the prosecutor's comments were improper, viewed together or individually, none of them would have undermined the fundamental fairness of the trial so as to amount to a denial of

due process. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471 (1986) (internal quotations omitted).

    C.    <u>Cumulative Error</u>

        Douglas cites the legal authorities that the cumulative impacts of the prosecutorial misconduct may require a reversal of a conviction but he makes no factual arguments or mentions cumulative error with regards to his own legal claims.  [Petitioner's Br. at 34]  Cumulative error is reviewed "under the same standard required for individual error-here, whether the improper comments as a whole 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Thornburg v. Mullin*, 422 F.3d 1113, 1137 (10th Cir. 2005) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868 (1974)).  The only trial errors asserted by Douglas concerned the prosecutor's final arguments and these claims were addressed above.  These comments did not so infect the trial with unfairness as to deny Douglas due process and Douglas makes no argument that the prosecutor's comments taken as a whole denied him of due process.  Therefore, this court should deny any claim that the cumulative impacts of the prosecutor's comments denied Douglas due process.

<u>CONCLUSION</u>

Douglas has not met his burden of showing that the court of appeals applied federal law in an unreasonable manner or was based on an unreasonable determination of the facts. Therefore, this court should deny Douglas's petition for writ of *habeas corpus*.

DATED August 22, 2006 , at Anchorage, Alaska.

DAVID W. MÁRQUEZ
ATTORNEY GENERAL

s/ Blair M. Christensen
    Assistant Attorney General
    State of Alaska, Dept. of Law
    Office of Special Prosecutions
        and Appeals
    310 K St., Suite 308
    Anchorage, Alaska 99501
    Telephone: (907) 269-6250
    Facsimile: (907) 269-6270
    e-mail: Blair_Christensen@law.state.ak.us
    Alaska Bar. No. 0311088

**Certificate of Service**

I certify that on August 22, 2006, a copy of the foregoing Entry of Appearance was served electronically on Mary C. Geddes.

s/ Blair M. Christensen