IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JERRY DOUGLAS,                    )
                                  )
            Appellant,            )
                                  )
vs.                               )
                                  )
STATE OF ALASKA,                  )
                                  )
            Appellee.             )      Case No. A-08069
_____  )      Tr. Ct. No. 3AN-S99-4292 CR

APPEAL FROM THE SUPERIOR COURT
FOR THE STATE OF ALASKA, THIRD JUDICIAL DISTRICT
CONVICTION BY JURY VERDICT ON NOVEMBER 23, 1999
AND THE DENIAL OF THE MOTION FOR NEW TRIAL
DATED MARCH 16, 2002 BY JUDGE ELAINE M. ANDREWS

### BRIEF OF APPELLANT JERRY DOUGLAS

VRA CERTIFICATION

I certify that this document and its attachments
do not contain (1) the name of a victim of a
sexual offense listed in AS 12.61.140 or (2) a
residence or business address or telephone number
of a victim of or witness to any offense unless
it is an address used to identify the place of
a crime or it is an address or telephone number in
a transcript of a court proceeding and disclosure
of the information was ordered by the court.

FILED July 26, 2002
in the Court of Appeals for the
STATE OF ALASKA

CLERK OF THE APPELLATE COURTS

By: _Beth Meyer_
        Deputy Clerk

KALAMARIDES & LAMBERT
710 H Street, Suite 450
Anchorage, AK  99501
907/276-2135

Attorneys for Appellant
Jerry Douglas

Randall S. Cavanaugh
ABA #8812215

Exh. 1
Page 1

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . ii

AUTHORITIES PRINCIPALLY RELIED UPON . . . . . . . . . . vii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . 3

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 5

  I.   Facts . . . . . . . . . . . . . . . . . . . . . . 5

  II.  Points on Appeal . . . . . . . . . . . . . . . 27

  1.   Douglas' Trial Counsel was Constitutionally
      Ineffective give and the Trial Court Should
      have Vacated the Conviction . . . . . . . . . . 28

     A.   Ineffectiveness Standards . . . . . . . . . 28

        1.   U.S. Constitution . . . . . . . . . . 28
        2.   Alaska Constitution . . . . . . . . . 29

     B.   Failure to Conduct Factual Investigation . . . 30

     C.   Failure to Properly Cross-Examine . . . . . . 35

     D.   Failed to Present Exculpatory Evidence . . . . 37

     E.   Failure to object to improper evidence
        and seek limiting instructions . . . . . . . . 40

     F.   Failure to Request Lesser Included Offense . . 42

     G.   Personal Knowledge of the Prosecutor:
        Violation of the Witness-Advocate Rule . . . . 46

     H.   The Prosecution Made a Highly Improper Closing 48

i

Exh. 1
Page 2

1.   The Closing . . . . . . . . . . . . . .  48
2.   General Law . . . . . . . . . . . . . .  51

    i.   Improper Vouching by the Prosecution  52

    ii.  Using Poverty, Calling
         Douglas/cox 'Crackhead' and the
         Defense Strategy 'Repulsive',
         Arguing Addiction and Relative
         Financial Positions as Evidence
         and Argument . . . . . . . . . . . .  53

    iii. Inflammatory Argument . . . . . . .  53

I.   Cumulative Error . . . . . . . . . . . .  54

CONCLUSION . . . . . . . . . . . . . . . . . . .  54

Exh. 1
Page 3

## TABLE OF AUTHORITIES

Page

### Statutes

AS 12.72.040 . . . . . . . . . . . . . . . . . . xi

AS 22.07.020 . . . . . . . . . . . . . . . . xi, 1

### Cases

Annas v. State,
126 P.2d 552, 559 (Alaska App. 1986) . . . . . . . 27, 45

Arnold v. State,
685 P.2d 1261, 1265-67 (Alaska App. 1984) . . . . . . 31

Barry v. State,
675 P.2d 1295-96 (Alaska App. 1982) . . . . . . . . 42

Bentley v. State,
397 P.2d 976 (Alaska 1965) . . . . . . . . . . . 38, 39

Buford v. United States,
__ F.3d __ (9th Cir. 2002)
Release date, February 8, 2002] . . . . . . . . . . 52

Clifton v. State,
758 P.2d 1279 (Alaska App. 1988) . . . . . . . . . 37

Crotts v. Smith,
73, F.3d 861, 866 (9th Cir. 1996) . . . . . . . . 35

Darden v. Wainwright,
477 U.S. 168, 181 (1986) . . . . . . . . . . . . 51

Darling v. State,
520 P.2d 793 (Alaska 1974) . . . . . . . . . . . 52

Davis v. Alaska,
415 U.S. 308, 316 (1974) . . . . . . . . . . . . 35

Delaware v. Van Arsdall,
475 U.S. 673 (1986) . . . . . . . . . . . . . 35

Dickson v. Sullivan,
849 F.2d 403, 408 (9th Cir. 1988) . . . . . . . . 40

iii

Exh. 1
Page 4

Drumbarger v. State,
    716 P.2d 6, 16 (Alaska App. 1986) . . . . . . . . . . 54

Eggleston v. United State,
    798 F.2d 374, 376 (9th Cir. 1986) . . . . . . . . . . 27

Eubanks v. State,
    516 P.2d 726, 729 (Alaska 1973) . . . . . . . . . . 53

Evans v. Lewis,
    855 F.2d 631 (9th Cir 1988) . . . . . . . . . . 32

Evitts v.  Lucy,
    469 U.S. 387, 394 (1985) . . . . . . . . . . . . . 28

Garner v. State,
    711 P.2d 1191, 1195 (Alaska App. 1986) . . . . . . . . . 4

Garroutte v. State,
    508 P.2d 1190 (Alaska 1973) . . . . . . . . . . 54

Gould v. State,
    579 P.2d 535, 538 (Alaska 1978) . . . . . . . . . . 53

Hawley v. State,
    614 P.2d 1349, 1361 (Alaska 1980) . . . . . . . . . . 4

Henderson v. Norris,
    118 F.3d 1283, 12, 87 (8th Cir. 1997) . . . . . . . . 35

Jackson v. State,
    824 750 P.2d 821 (Alaska App. 1988) . . . . . . . . 32, 44

Johnson v. State,
    636 P.2d 47, 67 (Alaska 1981) . . . . . . . . . . . 4

Jones v. State,
    759 P.2d 558, 569 (Alaska App. 1988) . . . . . . . . 29, 30

Jones v. Wood,
    114 F.3d 1002, 1011 (9th Cir. 1997) . . . . . . . . . 29

Kanulie v. State,
    796 P.2d 844,(Alaska App. 1990) . . . . . . . . . . 48

Kimmelman v. Morrison,
    477 U.S. 365, 384 (1986) . . . . . . . . . . . . . 32

iv

Laraby v. State,
    842 P.2d 1275, 1280 (Alaska App. 1992) . . . . . . . . . 44

Love v. State,
    457 P.2d 622 (Alaska 1969) . . . . . . . . . . . . . . 4

Maryland v. Craig,
    497 U.S. 836, 845-847 (1990) . . . . . . . . . . . . . 35

Massey v. State,
    771 P.2d 448, 453 (Alaska App. 1989) . . . . . . . . . 40

Natkong v. State,
    925 P.2d 672 (Alaska App. 1996) . . . . . . . . . . . 37

O'Brannon v. State,
    812 P.2d 222, 226 (Alaska App. 1991) . . . . . . . . . 47

Patterson v. State,
    747 P.2d 535, 539 (Alaska App. 1987) . . . . . . . . . 51

Potts v. State,
    712 P.2d 385, 390 (Alaska App. 1985) . . . . . . 4, 48, 51

Powell v. Alabama,
    287 U.S. 45 (1932) (reversed) . . . . . . . . . . . . 31

Richards v. State,
    616 P.2d 870 (Alaska 1980) . . . . . . . . . . . . . 37

Risher v. State,
    523 P.2d 421, 424-25 (Alaska 1974) . . . . . . . . 26, 29

Sanders v. Ratelle,
    21 F.3d 1446, 1456 (9th Cir. 1994) . . . . . . . . . . 28

State of North Carolina v. Jones,
    __ S.E.2d __ (North Carolina 2002)
    [Release date, February 1, 2002] . . . . . . . . . . . 51

State v. Jones,
    759 P.2d 558, 569 (Alaska App. 1988) . . . . . . . . . 31

State v. Laraby,
    842 P.2d 1275, 1280 (Alaska App. 1992) . . . . . . . 4, 43

State v. Simpson,
    946 P.2d 890 (Alaska App. 1997) . . . . . . . . . 29, 37

State v. Steffensen,
    902 P.2d 340, 342-43 (Alaska App. 1995) . . . . . . . . 42

Strickland v. Washington,
    466 U.S. 668, 687-88, 694 (1984) . . . . . . . . 28, 29, 32

Thompson v. State,
    769 P.2d 997, 1005 (Alaska App. 1989) . . . . . . . . 54

U.S. v. Smith,
    521 F.2d 957 (D.C. Cir. 1975) . . . . . . . . . . . 38

U.S. v. Span,
    75 F.3d 1383, 1390 (9th Cir. 1996) . . . . . . . . 30, 43

United States v. Adamson,
    __ F.3d __ (9th Cir. 2002)
    Release date May 23, 2002] . . . . . . . . . . . . 39

United States v. Bagley,
    772 F.2d 482, 488 (9th Cir. 1985) . . . . . . . . . 40

United States v. Baker,
    40 F.3d 154, 162 (7th Cir. 1994) . . . . . . . . . 43

United States v. Cronic,
    466 U.S. 684 (1984 . . . . . . . . . . . . . . . 28

United States v. Edwards,
    154 F.3d 915, 921 (9th Cir. 1998) . . . . . . . . . 52

United States v. Frederick,
    78 F. 3d 1370, 1381 (9th Cir. 1996) . . . . . . . . 54

United States v. Hermanek,
    ___ F.3d ___ (9th Cir. 2002)
    (Release date, May 15, 2002) . . . . . . . . . . . 52

United States v. Jackson,
    882 F.2d 1444, 1449 (9th Cir. 1989) . . . . . . . . 53

United States v. McKoy,
    771 F.2d 1207, 1211 (9th Cir. 1985) . . . . . . . . 48

United States v. Mitchell,
    172 F.3d 1104, 1108-09 (9th Cir. 1999) . . . . . . . 53

vi

United States v. Vences,
    169 F.3d 611, 613 (9th Cir. 1999) . . . . . . . . . . . 4

United States v. Young,
    470 U.S. 1, 14-20, 105 S.Ct. 1038,
    1045-49, 84 L.Ed.2d 1 (1985) . . . . . . . . . . . . . 51

Williams v. U.S.,
    403 F.2d 176, 179 (D.C. Cir. 1968) . . . . . . . . . 38

## Constitutional Provisions

Constitution of Alaska, Article I . . . . . . . . . . . . xi, 29

Constitution of the United States,
    Amendment XIV.  Citizenship rights
    not to be abridged by states . . . . . . . . . . . . . . xi

## Rules of Court

Alaska Rules of Appellate Procedure 202 . . . . . . . . . xi, 1

Alaska Rules of Evidence 403 . . . . . . . . . . . . . . . . xi

Alaska Rules of Evidence 404 . . . . . . . . . . . . . . . xii

## Other

3 Federal Evidence, sec. 332 at 525-6
    (2nd Ed. 1994 & 1997 Supp.) . . . . . . . . . . . . 38

3A Wigmore on Evidence, sec. 1037m at 1044-5
    (Chadbourn rev. 1970 & 1998 Supp.) . . . . . . . . . . 38

A.B.A. Standards for
    Criminal Justice Sec. 3-5.8 (2d ed. 1982) . . . . . . 51

Commentary to Standard 4-4.1 . . . . . . . . . . . . . 30, 31

Exh. 1
Page 8

AUTHORITIES PRINCIPALLY RELIED UPON

**AS 22.07.020.  Jurisdiction.**

(a)  The court of appeals has appellate jurisdiction in actions and proceedings commenced in the superior court involving

(6)  probation and parole; and

**AS  12.72.040.  Burden  of  Proof  in  post-conviction  relief proceedings.**

A person apply for post-conviction relief must prove all factual assertions by clear and convincing evidence.

**Constitution  of  the  United  States,  Amendment  XIV.   Citizenship rights not to be abridged by states.**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.  No state shall make or enforce any law which shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Constitution of Alaska, Article I, §7.  Due Process.**

No person shall be deprived of life, liberty, or property, without due process of law.  The right of all persons to fair and just  treatment  in  the  course  of  legislative  and  executive investigations shall not be infringed.

**Alaska Rules of Appellate Procedure 202.   Judgments from Which Appeal May Be Taken.**

(b)  An appeal may be taken to the court of appeals from a final judgment entered by the superior or the district court, in the circumstances specified in AS 22.07.020.

**Alaska Rules of Evidence 403.   Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.**

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence.

A.B.A. Standards for Criminal Justice Sec. 3-5.8 (2d ed. 1982) provides:

> (a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

> (b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

> (c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

> (d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

> (e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.

**Alaska Rules of Evidence 404. Character Evidence Not Admissible to Prove Conduct--Exceptions--Other Crimes.**

(a) **Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

1 A.B.A. Standards for Criminal Justice, Sec. 3-5.8 (2d ed. 1982).

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the

prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b)  It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c)  The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d)  The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(e)  It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.

x

## JURISDICTIONAL STATEMENT

Douglas appeals from the denial of his motion for a new trial due to his counsel's ineffectiveness and his conviction by the jury. Douglas was convicted on November 23, 1999. A motion for a new trial was denied by Judge Andrews on March 16, 2001. Notice of Appeal was timely filed on July 26, 2001.

This appeal is brought as a matter of right pursuant to AS 22.07.020(a). This court has jurisdiction over this appeal pursuant to AS 22.07.020(a)(6) and Rule 202(b) Alaska R. App. P.

1

# ISSUES PRESENTED FOR REVIEW

A.   Douglas' trial counsel was constitutionally ineffective and the trial court should have vacated the conviction.

B.   Failure to Conduct Factual Investigation.

C.   Failure to Properly Cross-Examine.

D.   Failed to Present Exculpatory Evidence.

E.   Failure to object to improper evidence and seek limiting instructions.

F.   Failure to Request Lesser Included Offense.

G.   Personal Knowledge of the Prosecutor: Violation of the Witness-Advocate Rule.

H.   The Prosecution Made a Highly Improper Closing.

   i.   Improper Vouching by the Prosecution.

   ii.  Using Poverty, Calling Douglas/cox 'Crackhead' and the Defense Strategy 'Repulsive', Arguing Addiction and Relative Financial Positions as Evidence and Argument.

   iii. Inflammatory Argument

I.   Cumulative Error.

2

## STATEMENT OF THE CASE

Douglas was originally charged with Robbery in the Second Degree and he was arrested with a warrant while in custody. [Exc. 1-2]   Under AS 11.41.500(a), he was indicted on Robbery in the 1st degree. [Exc. 3-4] He was indigent and appointed James Hopper as counsel.  No motions were filed and the case proceeded to trial. [Exc. 5-8]   Douglas took the stand in his own defense. [Tr. 222-289] No lesser included in the instructions were requested by the defense. [Exc. 9-35] The jury instructions from the court had the lesser included for second degree robbery. [Exc. 36-42] The jury returned a verdict of guilty. [Tr. 358] Douglas complained that he received ineffective assistance of counsel. [Exc. 43-45]

A motion for a new trial was filed based on the fact that Douglas had a CINA matter pending and there was a need for an expedited resolution.  [Exc. 46-68]  Attached to the motion was an Exhibit A [Exc. 69-202]   The Prosecutor opposed. [Exc. 203-233] Mr. Hopper was deposed [Exc. 235-264] Douglas replied. [Exc. 269-288] John Murtagh, an expert, wrote a letter indicating that Hopper's representation was constitutionally deficient. [Exc. 289-305] An evidentiary hearing was held and the trial court denied the motion for a new trial. [Tr. 362-492] Douglas was sentenced to 12 years with 7 suspended. [Exc. 326-331]

3

## STANDARDS OF REVIEW

### Plain Error

    A)   State of Alaska.

Trial court's rulings on the admissibility of evidence are ordinarily subject to review only for abuse of discretion. Hawley v. State, 614 P.2d 1349, 1361 (Alaska 1980); Garner v. State, 711 P.2d 1191, 1195 (Alaska App. 1986). Relevant evidence is always subject to exclusion if, in the discretion of the trial court, its probative value is outweighed by the danger of prejudice or confusion or by considerations of undue delay. Johnson v. State, 636 P.2d 47, 67 (Alaska 1981).

To establish plain error, the defendant must show that the error was "(1) so obvious that it must have been apparent to a competent judge and a competent lawyer even without objection, and (2) so substantially prejudicial that failing to correct it on appeal would perpetuate a miscarriage of justice." Potts v. State, 712 P.2d 385, 390 (Alaska App. 1985) Love v. State, 457 P.2d 622, 630 (Alaska 1969); United States v. Vences, 169 F.3d 611, 613 (9th Cir. 1999).

Whether an attorney's performance constitutes ineffective assistance of counsel is a mixed question of fact and law. State v. Laraby, 842 P.2d 1275, 1280 (Alaska App. 1992).

4

## ARGUMENT

I. __Facts__.

The prosecutor's opening statement outlined how Ali made his living driving a cab to support his family and that he is going to college. The prosecutor indicated that there was a call. Ali responded and drove a couple (Douglas and Cox) at 2:00 a.m. in the morning to Wal-Mart to make a return. Then Ali drove them back to the Vista Grande apartments. The full fare was $24.00, but the couple only had $20.00. Later Ali received a call back to the apartment building again. Douglas wanted to go to the Sullivan Arena area. Ali became nervous and an angry Douglas demanded to be returned to the Vista Grande Apartments. Ali said Douglas put his hand under his coat and demanded money with the words 'Give me all your money or I'll kill you'. Ali gave Douglas $80.00-$90.00 then called the police and Officer Trull responded. Officer Trull served the defendant, but it took awhile. [Tr. 10-21] The defense reserved opening. [Tr. 23]

Ali was the first witness. Ali said he was a cab driver, had one child, a member of the U.S. Army reserves, attended college and had never been robbed before. [Tr. 24-28]. As to the robbery, Ali remembered talking to Officer Trull; however, he did not remember the date but thought it was in the fall. Ali thought there was

5

snow on the ground. [Tr. 30-32] Ali reported he called 911 and officers responded. [Tr. 33]

Ali testified that he gave two people a ride and it was about midnight to 1:00 a.m. It was a male and female who were both white. They wanted a ride to Wal-Mart to return something. [Tr. 33-35] He then returned them to the Vista Grande apartment. The fare was $22.25, but the couple told him that they only had $20.00; therefore, he accepted the $20.00 and left. [Tr. 36]

Later he received a call to go to the Grande Vista from Apartment 108. It was the guy whom he gave a ride to earlier in the evening. Ali questioned why the guy would call for a cab when they did not have enough money the first time. The guy told him that his girlfriend didn't have the money, but he has the money. The guy wanted a ride to the Sullivan Arena area. Ali questioned why the guy wanted to go there so late as it was 2:00 a.m. to 3:00 a.m. Ali drew a map outlining the route he drove to and from the Sullivan Arena area. [Tr. 38-41, 73-74] Ali reported that he got scared and called his dispatcher to advise them that guy from 108 was from 99. This made the guy angry and told Ali to drive him back to the Grande Vista. This was marked as Plaintiff's Exhibit #1 and it was accepted into evidence without objection. [Tr. 42-44] [Exc. 69-76]

After Ali charged the guy $24.00 for the fare, the guy put his hand underneath his jacket and demanded the money or he would be

killed. Ali gave him between $80.00 to $90.00 from his shirt pocket. He was scared and called 911 on his cell phone, then he called his dispatcher to report what happened. [Tr. 45-47] Ali told Officer Trull that he did not see a weapon. Ali's statement was marked as Plaintiff's Exhibit #2.

On cross-examination, Ali could not remember the date. Ali agreed that the original pick up time and time of robbery varied. At grand jury, he said it was a 4 hour period. At trial it was determined to be a 2 hour period. [Tr. 53] Ali stated that they did not have a back pack. Ali could not remember if he told Officer Trull if they had a back pack. [Tr. 57-58, 62] He could not remember how the woman was dressed. [Tr. 59] Ali said that during the course of the drive to Wal-Mart, he had a conversation with the couple. During the trip, the couple saw a car flipped over on the highway and told him to call his dispatcher to report the accident. He called 911. [Tr. 61]

Ali could not remember what was said between the couple as he was driving them. He was not sure how long they were in the store. At one point he told Officer Trull they were in the store 5 to 6 minutes, the grand jury 15 to 20 minutes; it was just 'normal time'. Ali said Douglas had a hood, but stated another time a sweater; however, he could not remember. He didn't remember telling Officer Tull if it was a black jacket. [Tr. 61-64]

Hopper went through the 2nd call with Ali. Ali stated he later took a call from Vista Grande again. The guy said he had a fight with his girlfriend and he was looking for her. The guy wanted to go down East 15th. [Tr. 76-77] Part way down East 15th, he called his dispatcher because he was scared. Ali claimed that his guy grabbed the microphone. Ali could not remember if he told Officer Trull that information. He told the dispatcher his passenger was from Apartment 99, not 108. This made the guy mad and he demanded to go back to the apartment building. [Tr. 80-81] On cross-examination, Ali confirmed that it was a couple of months after the robbery that he mentioned the hand under the sweater. He was not sure if he spoke to the dispatcher, via cell phone, about the topic of a 'weapon'. [Tr.89-91] Ali confirmed he met with Officer Trull at Carrs to see the photo-line up. Ali stated Officer Trull never asked him about this at Carrs. [Tr. 94-96] On cross-examination, Hopper and Ali debated whether he reported the robber as running. Ali admitted that he left a few things out. [Tr. 101-03] However, he could not remember about the backpack. Ali confirmed that his testimony was a combination of memory and listening to the tape. [Tr. 103-105]

Karen Bell, a manager from Wal-Mart, testified on behalf of the State. [Tr. 110-112] She testified there was a product returned about 2:00-2:20 a.m. A small black and white television was returned. The return document was signed by Jerry Douglas, but his

Alaska driver's license said Jerry Lee Douglas. She indicated that
he had a woman with him, but she could not identify Douglas in the
court room. [Tr. 122]

Amy Ahmed, general manager of Yellow Cab, testified on behalf
of the State and she had the dispatch records for that night. The
first call was to the Vista Grande apartments at 2:00 a.m. to
2:15 a.m. Then there was a second call between 3:00 a.m. to
3:30 a.m. On cross-examination, Ahemd could not state why there
were lines through '108', nor could she confirm where the cab went
or when it came back into service. [Tr. 133-143]

Officer Trull was called to testify on behalf of the
Prosecutor. He responded to dispatch Code 3, lights and sirens.
Officer Trull thought the suspect may have fled into the apartment,
but they did not locate him. His identity was found through Wal-
Mart. [Tr. 144-150]

On cross-examination, the defense asked Officer Trull about
the description of the man in the cab. He confirmed to defense
counsel that he spoke to Ali for about 10 minutes. Officer Trull
also described the female as it was given by Ali. [Tr.161-165]
There was no questioning by Hopper whether Ali mentioned a weapon,
hand under the jacket/sweater, or any questions about whether Ali
understood the questioning process. The prosecution rested.

The defense noticed they were going to call Ms. Cox, the
girlfriend of the defendant. [Tr. 176]. The State said they were

going to question Cox about a crime she committed where the defendant was present. The defense objected, but stated he was going to elicit that the two (Cox and Douglas) lived together and basically were doing drugs. The defense agreed she could be asked if the defendant was present at the theft. [Tr. 167-170]

Hopper gave his opening statement. He admitted to numerous bad acts on behalf of his client and his girlfriend to the jury. They were using drugs and not working due to drug usage. Their car was impounded and they were staying at a crack house. It was at this time they returned the television and engaged in a conversation with Ali. Ali expressed an interest in obtaining drugs. Douglas said he would call Ali back, it was at this time Ali came back to Vista Grande and the two went to the Sullivan Arena area in order to obtain drugs from Douglas' dealer. Douglas said that the drug dealer was not home but he would call when the drugs were delivered. Ali was a participant in a drug deal, but when the drug deal did not happen so he reported a robbery [Tr. 172-75]

Vicki Cox was called on behalf of the defense. She told the jury how DFYS took their three children away. They had no jobs and they both were using drugs. She confirmed that she and Douglas stayed in a crack house when they were in town. They went to Wal-Mart to exchange the television for crack money. [Tr. 175-80] She stated that Douglas was not wearing a jacket, but a vest and that she did not have a back pack, just a purse. Cox indicated she

10

received $60.00 for the television. She cut a deal with Ali as to the fare because she wanted more money for drugs. Back at the apartment, she tried to get connect by calling her dealers. She was not sure when Douglas left because she was stoned. Cox testified that when Douglas came back home he said he needed to get more dope. Douglas said nothing about a robbery. [Tr. 182-190]

On cross-examination, Cox admitted she was convicted of a crime of dishonesty and Douglas was there. There was no objection. Cox admitted she was addicted to the stuff and Douglas use it with her. The prosecutor questioned Cox about drug usage and its effects. [Tr. 194-197] Cox admitted they had been smoking crack earlier that day. [Tr. 202] Again, no objection. Cox said they tried to get drugs, but were not getting calls back. Cox admitted they used Douglas' identification to return the television because she has returned too many things already. [Tr. 206-09] Again, there was no objection levied by the defense. When Douglas returned from the second trip, he had $40.00. [Tr. 214]

On re-direct examination, Cox admitted she asked for a break on the cab fare from Wal-Mart, but did not have a kid. Douglas was on unemployment after losing his job at 7-11. Douglas said to her that somebody wanted to go in on a package of dope. [Tr. 220]

Douglas took the stand on his own behalf. On direct from Hopper, Douglas described his relationship and admitted his child had been taken away. Douglas also admitted to being unemployed and

11

using drugs. Douglas stated he and Cox were getting by on her money and his unemployment. He previously resided at the Teen Challenge center for drug treatment and left due to violations. He was still in denial on drugs and did not complete the program. [Tr. 222-28]

On the day in question, Douglas admitted having the television and going to Wal-Mart with Cox to exchange it. Ali was the driver of Yellow Cab and that they had been doing drugs that day. [Tr. 231-32] He confirmed the television was exchanged for $60.00. Douglas said that there was no back pack and that he was wearing a vest, not a coat with a hood. [Tr. 236-37]

Douglas testified that on the way back to the Vista Grande apartment building he and Ali talked about smoking crack. Ali was asking Douglas what kind of connections he had. Douglas thought Ali was going to go in for an "eight-ball". Instead, Ali only wanted $40.00 to $50.00 worth. Douglas stated if he got $50.00, he would have gotten a $100.00 worth from the right source and given Ali some of it. Douglas did not routinely do this because he lived "the lie" whereby he did not want people to know that he did the stuff. Douglas admitted he knew drug dealers and even while high, played off like he was not smoking it. [Tr. 239-44]

Back at the Vista Grande apartments, Douglas told Ali he might be connecting with him later. Douglas stated that Cox never stated to Ali the baby and needing the money for food in order to get a break on the cab fare. He said Cox would get very mad at him if he

was smoking crack and mentioned the baby because they were messing up their lives. Douglas denied having any contact with Apartment 108 [Tr. 245-247, 250] Douglas called to have the same cab driver return to the apartment, but he did not know the driver's name or the cab number. Douglas and Ali discussed that they were going to go to his dealer's residence over by the Sullivan Arena area. Douglas showed Ali $40.00 and Ali was going to pool his money with his. Douglas told him that if they had $100.00, they could get $200.00 worth of drugs and Ali agreed to go along with that. Douglas admitted that he had been 'beat' as to drugs; he sold a dummy pack or had his money taken off with. [Tr. 250-253]

Douglas advised the jury that the dealer they were going to buy from was one he went through a lot. The dealer would know his phone number when Douglas paged him. [Tr. 254] There was no cautionary instruction or limiting instruction requested by the defense. Douglas testified that he never mentioned a fight with his girlfriend. [Tr. 254] They went to the Sullivan Arena area and did not see the dealer's vehicle; therefore, they did not stop and drove back to the Vista Grande apartments. Douglas went back inside the apartment with Ali's $65.00 while Ali waited in the parking lot in his cab. [Tr. 256-57, 260] The plan was to call dealers in order to find some drugs. [Tr. 259] Ali was getting agitated and thought Douglas was not going to deliver the drugs or

return the money. [Tr. 262] None of the dealers ever returned the calls or pages over the course of half an hour. [Tr. 264]

Douglas testified that he did not rob Ali and he did not go outside to see Ali. [Tr. 266-267, 269] While in custody from a parole violation from Teen Challenge, Douglas was surprised as to the robbery he was being charged with.   Again, no cautionary instruction was requested or given. Douglas, when asked if he gave the money back, replied "It was not my intention to beat him". He denied touching the microphone and threatening to kill him. [Tr. 266-68]

Hopper asked his client why would Ali make that up? Douglas said he didn't know. Douglas also stated he didn't know why Ali's statements changes from the 911 to the interview with the cop or why his statements changed from the grand jury. Douglas denied having a gun and pointed out that he could not run because he had a knee injury.  Hopper asked Douglas how long he had been injured. Douglas tried to figure out how long using his length of being in custody at CIPT. [Tr. 268-271] Again, no cautionary instruction or limiting instruction requested or given. Douglas stated that he felt bad about taking the money and not delivering the dope. If he had gotten dope, Ali would have gotten some dope. Douglas admitted to having been convicted of more than one crime of dishonesty. [Tr. 271]

The prosecutor then cross-examined Douglas without an objection or cautionary instructions. [Tr. 271] Douglas confirmed he had been convicted of five dishonest crimes. He stated he did not agree with all the statements of Ali. [Tr. 272, 274] Douglas confirmed he was in the cab, there was an exchange of money, and that he was in the photo-line up [Tr. 274] The prosecutor had Douglas confirm it was important to hold people responsible to their actions. [Tr. 275] The Prosecutor asked Douglas if smoking crack cocaine was illegal; he agreed. [Tr. 275] The prosecutor asked about drug treatment. Douglas stated it was through DFYS. There was a question about the Teen Challenge violation. [Tr. 276] Again, there was no relevance objection sought by the defense or cautionary instruction. Douglas confessed to using cocaine and the information when to a probation officer. Douglas mentioned 'cops showed up on him' and he was violated. [Tr. 277]

The prosecutor then asked Douglas who his dealer was, but Douglas refused to answer. The prosecutor mentioned that they may want to talk to him. [Tr. 280] Once again, there was no relevance objection by the defense or cautionary instruction by the court. Douglas stated that if he gave his dealer $100.00, he would get $200.00 worth because he had already spent thousands of dollars with the dealer. The prosecutor asked if Douglas lied about his drug dealings. [Tr. 280-282] Douglas stated that Cox did the

15

dealings because he was on probation. [Tr. 282] Again, no objection or limiting or curative instruction was sought by the defense.

The prosecutor then questioned Douglas about the specific night in question. [Tr. 283] Douglas made calls while Ali waited in the parking lot. Douglas did not go outside again and he did not let them (Cox and Major) know someone was waiting [Tr. 283-84] Then the prosecutor started asking Douglas how he meets new dealers. [Tr. 282] Again, there was no objection from the defense. The questions turned to how Douglas made sure not to deal with a cop or an informant. [Tr. 286] Again, no objection from the defense. The defense rested. [Tr. 307] The prosecutor called Officer Trull in rebuttal. He testified that he was dispatched to the scene at 3:22 a.m. [Tr. 308]

The prosecutor did his closing and there was no objection. Due to space constraints, it is set forth more fully in the improper closing portion.

Hopper made his closing statement. [Tr. 325-342] He agreed it was a credibility to call Douglas and Ali. [Tr. 326] The prosecutor made a rebuttal and asked the jury to find Douglas guilty, which they did. [Tr. 354, 358]

Hopper was discharged as counsel and new counsel was appointed. A motion for new trial was filed with the court. [Exc. 46-202] Douglas did an affidavit stating that Hopper was ineffective. [Exc. 43-45] The prosecution opposed. James Hopper

16

was deposed and the deposition was filed with the court. [Exc. 235-268]

Hopper was deposed regarding the case since he did not respond to a request for an affidavit. Present at the deposition for the prosecution was McLaughlin. Douglas was present telephonically, but did not participate. Hopper is an experienced criminal defense attorney who had done criminal defense trials and had asked for lesser included charges. Hopper had been a state trooper while going to law school. Hopper had asked for lesser included charges in other cases. Hopper knew how to impeach a witness with an inconsistent statement because he had done this previously. [Exc. 239] Hopper knew that Ali had made inconsistent statements concerning the level of the robbery; specifically, statements that upgraded the robbery in the first degree to robbery in the second degree. [Exc. 239]

Hopper received the 911 tape and interview tape of Officer Trull from the prosecution. [Exc. 240] He admitted that Ali did not sound as though he was in shock on the interview tape. [Exc. 246] Hopper admitted that Officer Trull asked "is there anything else" (or words to that effect) to Ali. [Exc. 247] Hopper did not remember if he cross-examined Officer Trull on the statements or demeanor of Ali. [Exc. 246] Hopper stated that he ran Ali's background check twice. However, he did not find the civil materials. [Exc. 240]

17

Hopper knew that Douglas believed the robbery was in fact not a robbery, but a theft which was told to him on two separate occasions. [Exc. 242] The defense theory was that Douglas received the money from Ali for a drugs, but Ali did not receive the drugs or the money back. [Exc. 245] It was not Douglas' intent to keep the money, but it worked out that way. Eventually, the dope did arrive and Douglas ended up smoking it. [Exc. 246] It was Douglas' thought that if the jury thought he was a 'nice guy', the jury would not convict him. The defense theory was that Douglas received the money from Ali for drugs, but Ali did not receive the drugs or the money back. [Exc. 245, 251, 252] Essentially, the argument was for 'jury nullification'. [Exc. 253] It was not Douglas' intent to keep the money, but it worked out that way. [Exc. 248] Essentially, it was an "all or nothing defense". [Exc. 257]

Hopper was aware of the sentencing impact of various charges in the case. Douglas had a prior felony and was presumptive. He knew the presumptive for either a B felony or a C felony for Douglas. [Exc. 240] Douglas was willing to plead to a felony as long as he was able to get drug treatment. [Exc. 241, 252]

Hopper acknowledges that theft can be a lesser for robbery. [Exc. 241] Discussing a lesser included charge for trial as compared to plea negotiations is different. [Exc. 244] Hopper admitted that the lesser included for theft was not asked for.

18

[Exc. 245] Hopper stated that he did not think the lesser included applied and that Douglas would not permit it. [Exc. 245, 248] Hopper had no recollection of advising the court that Douglas did not want a lesser included charge.[Exc. 245] It was Hopper's policy to document a client's refusal as to lesser included charges in his notes. [Exc. 245] Hopper stated that Douglas would call his office 26 times a day. Hopper did not send things to him in writing as normal practice. [Exc. 245, 250]

Hopper took notes verbatim of what the defendant would say. [Exc. 241-247] Hopper testified that he discussed lesser included charges with Douglas but his notes does not reflect it. He had pulled the law on theft and the transitional statement. [Exc. 244] Hopper reviewed all his notes. There were no notes about lesser included charges being discussed. [Exc. 248] Lesser included charges could have been discussed on the record. [Exc. 248]

Hopper met with Douglas and discussed what should and should not be discussed. [Exc. 247] Prior to Douglas taking the stand, Hopper thought there was a possibility he would be acquitted of robbery. Douglas told Hopper that he thought he was going to be acquitted. Hopper did not agree with his opinion, but did not tell him. [Exc. 249-250] In Hopper's opinion, Douglas did everything that he was told not to do. [Exc. 253] Douglas' performance was bad. Hopper did not tell Douglas that his performance was terrible on the stand he should has for a lesser included charge. Douglas

19

probably did ask Hopper how he did, but Hopper was not honest with him about it. [Exc. 253]  John Murtagh was retained as an expert. He drafted a letter dated December 15th stating that Hopper was constitutionally ineffective after an exhaustive review of the Douglas matter. [Exc. 289-305, Tr. 364]

The court granted an evidentiary hearing. Murtagh was called as the first witness. It was stipulated by the prosecution that Murtagh was an expert in criminal defense [Tr. 363-64] Murtagh outlined the basis for his opinion at to Hopper's ineffectiveness. [Tr. 364-65].  Murtagh stated that Hopper failed to discover civil cases that contained evidence of fraud that was admissible; specifically, a deposition in a civil case.  Ali committed tax fraud by over-reporting expenses and claimed a dependant that may not have been on this continent.  There were landlord/tenant matters that could have been used in the trial against the prosecution's theory that Ali was a simple immigrant trying to live the American dream.  From the materials, Ali was a landowner, experienced litigant and tax fraud. [Tr. 366-367]

Murtagh believed that Hopper was savaged by the prosecution by not presenting Ali's inconsistent statements as substantive evidence.  Hopper could have used the transcript or the tapes of Ali with Officer Trull or the taxi dispatch tape.  The tapes would have been the best evidence as to Ali's demeanor at the time and whether fair questions were asked. The tapes were inconsistent as

to how Ali presented himself at trial. [Exc. 6-76, Tr. 370-71]  The jury never heard the question that Officer Trull asked Ali: "Did he threaten you with any kind of weapon, or anything?"  Officer Trull also asked Ali a catch-all question at the end of the interview. [Tr. 372] [Exc. 69-76] Hopper never brought this out and his deposition indicated he knew how to impeach with a prior inconsistent statement. [Tr. 373] Murtagh agreed that the credibility of the complaining witness was the heart and soul of the case. No money was recovered and there was no confession.  It was Douglas' word against Ali's. [Tr. 380]  Hopper knew the inconsistency of the statements and the opinion evidence as Ali was important.

Murtagh also addressed the failure to ask for the lesser included of theft.  The prosecution asked for a lesser included of robbery in the second degree.  None was proffered by the defense. [Tr. 373] [Exc. 9-35] Murtagh reviewed all the notes in Hopper's file. Douglas told Hopper it was a theft, not a robbery.  There was no indication in the client contact forms or telephone sheets to show he discussed lesser includes with Douglas. Hopper said he did in his deposition. [Tr. 373-374] In Douglas' testimony that "he kept the money" constituted theft; there was sufficient evidence to warrant the request for the lesser included.  Murtagh noted that Hopper's testimony at the deposition was inconsistent; Hopper did not think it would apply, and Douglas would not allow it. [Tr. 374-

21

375] This was contradicted by Hopper later in his deposition. [Tr. 377] Murtagh thought Hopper had complete notes. It was Hopper's normal policy to document refusals of lesser included instructions. Murtagh agreed that Hopper agreed in his deposition that his notes did not include any mention of lesser included charges. [Tr. 376-378]

Murtagh also noted that Hopper was inconsistent as to Douglas and his testimony. First he states that he told Douglas he did not do well on the stand, then he was not honest with Douglas as to his testimony. [Tr. 379-380] Murtagh thought the civil materials would have undercuted the persona as set forth by the prosecution and it could have affected the outcome of the trial. Murtagh indicated that it should be a normal practice of a criminal defense attorney to review the civil files of a complaining witness as a component of competency. There was no tactical reason for Hopper not to have played either the 911 tape or impeach Ali with the materials from Officer Tull. [Tr. 380-381]

On cross-examination, Murtagh stated it appeared that Hopper did make a good faith effort attempt to look at the civil and criminal background of Ali. [Tr. 382] Murtagh thought the landlord materials would come into trial, as well as the tax materials. [Tr. 384-387] After extensive debate, the prosecutor asked Murtagh: ". . . in your opinion, Mr. Hopper was ineffective and fell below the standards in the following ways . . .?" [Tr. 402]    Murtagh

22