UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JERRY LEE DOUGLAS,<br><br>                Petitioner,<br>vs.<br><br>SUPERINTENDENT ZEE HYDEN,<br><br>                Respondent. | 3:03-cv-0221-JWS-JDR<br><br>**RECOMMENDATION<br>REGARDING AMENDED<br>PETITION FOR WRIT OF<br>HABEAS CORPUS**<br><br>(Docket No.13) |

The court has now before it the merits of the amended petition for writ of *habeas corpus* filed by Mr. Jerry Lee Douglas. (Docket No. 13). His opening brief is filed at docket No. 54. The respondent's response was filed at docket No. 106-1 and Douglas filed a reply at docket No. 116. As part of the instant briefing, and by way of a separate motion, Douglas sought to expand the evidentiary record, or, alternatively, have an evidentiary hearing. The court denied that motion and a subsequent motion for reconsideration/clarification. (Docket Nos. 111 and 113). For the reasons that follow, the petition for writ of *habeas corpus* should be denied.

**ISSUES PRESENTED**

This case presents the following issues: (1) Whether Douglas' trial attorney rendered ineffective assistance of counsel by failing to adequately investigate his case, not introducing certain impeachment evidence, and not seeking a lesser

included offense jury instruction; and, (2) Whether the prosecutor at trial committed prosecutorial misconduct, thereby denying Douglas a fair trial.

## BACKGROUND

Douglas was convicted of first degree robbery in a jury trial in Alaska Superior Court. The victim of that crime was a taxi driver named Muhammed Ali. Following the verdict, Douglas moved for a new trial on the ground that his trial counsel was ineffective. His trial attorney, James Hopper, was deposed and an evidentiary hearing was held. The motion for a new trial was denied and Douglas appealed that decision and his conviction to the Alaska Court of Appeals. That court affirmed the trial court's decision and Douglas' conviction. He then filed a petition for hearing before the Alaska Supreme Court which was denied.

The evidence at trial pertinent to this court's analysis – recited in an introductory fashion in the respondent's brief but not Douglas' – and recited in the Alaska Court of Appeals decision – was as follows. In Anchorage Alaska, on May 13, 1999, at approximately 2:15 a.m., Ali was dispatched to pick up a fare at Apartment 99 of the Vista Grande Apartments on West 14th Avenue. Ali arrived there and picked up Douglas and his girlfriend and drove them to a Wal-Mart store in the Dimond Center. After they arrived at the store Douglas asked Ali to wait for them while they went inside. Douglas and his girlfriend came out a short time later and Ali drove them back to where he had picked them up. Ali told them the fare was $22.25. Douglas' girlfriend told Ali they only had $20.00. Ali told them that was fine and that $20 dollars was good enough. He then accepted the $20.00 and drove off.

Approximately 45 minutes later, around 3:00 a.m., Ali received another dispatch to the vista Grande Apartments, but this time it was to Apartment 108. When Ali arrived, Douglas was waiting for him in the parking lot. Since Douglas and his girlfriend had not had the money to pay the full fare earlier the night, Ali asked Douglas

if he had enough money to pay him for another trip. Douglas said he had the money and asked Ali to take him to an area near the Sullivan Arena to look for his girlfriend. When they got near the Sullivan Arena, Douglas told Ali to turn onto another street. Ali became frightened and radioed the his dispatcher to report his location.

Ali testified that Douglas became angry and asked Ali why he was calling his dispatcher. Douglas then told Ali to drive him back to his apartment. Ali drove Douglas back to the Vista Grande Apartments and told him the fare was $4.00. At that point Douglas put his hand inside his jacket and told Ali to give him all his money or he would kill him. Fearing that Douglas had a gun, Ali gave him all the money he had – approximately $80.00 to $85.00 – and Douglas then ran into the apartment building.

Ali called 911 from the cab on his cellular phone. Officer James Trull arrived at the scene shortly thereafter and took a statement from Ali. During the interview, Officer Trull asked Ali if the suspect had threatened him with a weapon. Ali replied "I did not see any weapon sir. When he told me give me your money before I kill you, so I just took out the money." Ali later testified that he had not, in fact, seen a weapon and he admitted that he had not told officer Trull or the 911 operator that Douglas had put his hand inside his jacket as if he had a gun.

When asked by the prosecutor to explain why he had not mentioned this to police, Ali stated:

*Q* Okay. And I guess the question is: Why didn't you tell that to Officer Trull when he was first at the scene?

*A* Sir, the question was like: Did you see any weapon? So my answer was: No, I did not see any weapon. But I thought that he had a gun or something underneath his jacket, and I don't take the chance. So I thought – you know, money, I don't care about the money. . . .

Defense counsel pressed Ali for an explanation of why he had not earlier told this to the police:

Q  On your cell phone call to the police, do you recall the dispatcher asking you two times whether the man had a weapon?

A  I'm not sure about it sir. I'm not sure.

Q  Well if I told you that that tape says that two times she asked if he had a weapon, and both times you answered no, is that – is that possible.

A  Yes sir. Probably – I mean, I didn't see any weapon, so how do I know?. . . The thing is, when he put his hand down underneath his jacket, I did not take the chance whether he got any weapon or not. And I don't want to take the chance, just because the money, you know, for whatever money, $80, $90, whatever. I just give it to him.

Q  Do you think it was important, that it made a difference whether he might have a weapon or didn't have a weapon?

A  Yeah, I was scared, because his hand when he put his hand underneath his jacket, I was scared he might have a gun or not, you know. Maybe or maybe not, your know? And I don't – I don't want to take the chance, you know, give somebody a chance . . . .

After speaking to Ali, Officer Trull went to Dimond Wal-Mart and verified that Douglas and a female companion had returned a small television set to the store shortly after 2:00 a.m. that morning and had received a $60.00 refund. Officer Trull was told that Douglas had identified himself by showing his drivers license and that he had signed a receipt for the refund (which Trull also obtained). Based on this information, Officer Trull constructed a photo line-up and showed it to Ali about a week later. Ali

positively identified Douglas as the man who had robbed him. Douglas was arrested shortly thereafter.

Douglas also testified at trial. According to Douglas, during the first cab ride (to the Dimond Center), Ali asked Douglas to help him purchase some crack cocaine. Douglas testified that, after he returned home, he tried to arrange the cocaine sale. Thus, when Douglas called the cab company the second time, he specifically requested Ali's cab. When Ali arrived the second time, Douglas told Ali to cruise the area near the Sullivan Arena so that they could locate a crack cocaine dealer, but they were unable to find one. Ali then returned to the Vista Grande Apartments so that Douglas could make some telephone calls to locate a drug dealer. Ali waited outside while Douglas did this, but he gave Douglas $65 as an advance payment. Douglas continued that he was unable to locate a cocaine supplier until around 7:00 a.m. Then, when he returned to tell Ali the good news, he discovered Ali had left. Thus, Douglas argued there was no robbery, and Ali reported that Douglas had robbed him in order to recoup the $65.

At a hearing on his motion for new trial Douglas' trial counsel testified that he made a conscious decision not to introduce the tapes of Ali's conversations with the 911 dispatcher or the police officer because he felt that his cross-examination of Ali was going well. He further felt that playing the tapes might harm Douglas' defense.

In his motion for new trial Douglas also faulted his attorney for not seeking a jury instruction on the lesser included offense of theft. He argued that the jury might have believed that he in fact decided to simply embezzle the money rather than arrange for the sale of cocaine. The court of appeals concluded that Douglas version of events/argument did not constitute a lesser included offense, but rather a separate crime. Moreover, at the evidentiary hearing, Douglas' trial attorney testified that he consulted Douglas about the possibility of seeking a jury instruction on theft. According to the

trial attorney, Douglas was firmly opposed to a theft instruction because he feared the jury, unable to find him guilty of robbery, would use the theft instruction to convict him of something, since to defend himself against the robbery charge, he asserted he was willing to act as an intermediary in a drug deal. Douglas hotly disputed his trial attorney's testimony, but the trial judge found the attorney's testimony more credible than Douglas'.

Additionally, in his motion for new trial, Douglas asserted that he was entitled to relief because of alleged prosecutorial misconduct during final argument. Specifically, Douglas contended that the prosecutor improperly vouched for Ali's credibility, improperly argued that Douglas was prompted to commit robbery because of his drug addiction, improperly made arguments that had no evidentiary support, improperly made and argument based on his personal knowledge rather than the evidence, and improperly used inflammatory language when describing Douglas' girlfriend, Vicki Cox. Specifically Douglas complained of the following:

> *Prosecutor:* "Mr. Ali is trying to support his family and he's driving a cab at night....He's a person that his in the U.S. Army Reserves..... Are they going to tolerate [his] smoking.... crack cocaine? This guy's trying to hustle to make something better for himself and something better for his family.
> ...
> You can assess Mr. Ali's credibility from the stand–from the consistency within his testimony to you, and from the facts in his background about how much he would have to lose to get involved in [a crack deal], and lastly, how implausible the defendant's story is.
> ...
> There are victims that are all alone [when they] get robbed, ... and [they] come in and they do tell you the truth. And that's what Mr. Ali did. He came in and he told you the truth. And you don't have any reason to disbelieve him, [but] you have every reason to disbelieve what Mr.. Douglas told you."

Additionally, the prosecutor compared Ali and Douglas by making statements about Douglas' use of crack cocaine, his loss of parental rights in child protection proceedings,

and his past convictions for crimes of dishonesty. The prosecutor also made statements about the drug trade based on his own experience, stating *inter alia* "because I use to prosecute drug cases." He then went on to say that Mr. Douglas' testimony about being able to make a deal for $200 worth of cocaine for $100 did not make any sense because drug transactions do not work that way. Finally, the prosecutor also spoke about news reports about murdered taxi cab drivers and how Ali had read the headlines and was afraid he would not see his wife and children again. The Alaska Court of Appeals agreed that there was no evidence to support those statements by the prosecutor.

Douglas brings the instant petition on the grounds that the claims he made in state court were valid and they amount to his having been denied the right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution through the Fourteenth Amendment, and that he was denied a right to due process i.e., a fair trial, as guaranteed by the Fourteenth Amendment of the United States Constitution.

**THE LEGAL STANDARD**

Douglas' petition for writ of *habeas corpus* is governed by the substantive standards of the Anti-terrorism Effective Death Penalty Act of 1996 (AEDPA). The AEDPA provides that a federal court shall not grant a writ of *habeas corpus* to a state prisoner with respect to any claim adjudicated on the merits in state court unless: (1) the state court's decision was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

**DISCUSSION**

**I**
**INEFFECTIVE ASSISTANCE OF COUNSEL**

**A. The Failure To Discover And Use Certain Evidence**

Douglas claims that his attorney, James Hopper, was ineffective in his impeachment of the only complaining witness, namely, Ali. This ineffectiveness, he submits, manifested itself in two significant ways. First, he failed to adequately investigate the background of the complaining witness, and to utilize the results of such investigation for impeachment. Second, he failed to introduce evidence of inconsistencies in Ali's prior statements to effectively impeach the reliability of his testimony at trial. The Supreme Court has established a two pronged test for determining ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668, 685 (1984). In order to prevail on an ineffective assistance of counsel claim a petitioner must show: (1) counsel's performance fell below an objective standard of reasonableness; ***and*** (2) there is a "reasonable probability" that, but for counsel's unprofessional errors, there would have been a different result in the matter. The conjunctive "***and***" allows the court to consider the second prong alone. *Young v. Runnels,* 435 F.3d 1038, 1043 (9th Cir. 2006).

Douglas' claim that his attorney failed to adequately investigate Ali's background so as to successfully impeach him is premised on two arguments. First, that Hopper's investigation was deficient, and secondly that had he discovered the matters in question they could have been used to impeach Ali's credibility. The court proceeds directly to the second prong of the *Strickland* test. The information Douglas contends his attorney should have discovered and used was as follows:

(1). Ali was named in ten civil actions, and was named as the plaintiff in all but one, and appeared to represent himself in four of the ten cases.

(2). In a March 1997 deposition in a personal injury action prosecuted by Ali, he sought $50,000 in lost wages and other damages for injuries he suffered in two accidents involving his taxi.

(3). In that same deposition Ali agreed that he under-reported his income as a cab driver in tax years 1994 and 1995. He agreed that he had "literally pulled a figure out to the air" when he reported $7,695 as his income on his 1995 tax return. Ali further testified at the deposition that the number was not a reasoned estimate based on a formula of any kind. He conceded that – after expenses – he had daily cleared approximately $110 – $120. Although Ali stated that he had learned since those filings that it was illegal to under-report cash income and he intended to amend his returns, he had not done so by the time of his deposition.

(4). In this same deposition, Ali admitted that a claimed dependant, his wife's son from a prior marriage, actually lived with his wife's parents, and that it was his wife's parents who provided for the child. Ali said that his "support" of the stepson amounted to Christmas and birthday gifts and sending him some money every couple of months when "he" (presumably the child) asked.

According to Douglas, all of the above could have been used to impeach Ali's credibility and refute the prosecution's portrayal of him as a simple working "Joe" who the evidence showed was very "simple" and "straightforward". Conspicuously absent from Douglas' reply brief, however, is a retort to the respondent's argument that all of the above would have been inadmissible thereby eliminating the possibility of prejudice. This is understandable, since the court's research and analysis leads it to the conclusion that the respondent's recitation of the law is on the mark. Specifically, the Alaska Court of Appeals found that even if Ali intended to deceive the government when he under-reported his income and wrongly claimed a dependant, the Alaska Rules of Evidence do not allow the impeachment of a witness by collateral acts of dishonesty unless it resulted in a conviction for dishonesty in the preceding five years. In this regard Alaska Rule of Evidence 608 is very different than Federal Rule of Evidence 608. Whereas the federal rule allows for cross-examination of a witness regarding that

witness' specific instances of conduct probative of truthfulness or untruthfulness, the state rule expressly forbids such examination except for a conviction of crime involving dishonesty or a false statement under Alaska Rule of Evidence 609. No such conviction had occurred here. Thus, it is manifestly clear that the evidence of the statements would not have been admissible thereby rendering the failure to discover them in no way prejudicial to Douglas' case.[1]

As for the other information, the court is persuaded that the Alaska Court of Appeals was correct in agreeing with the trial judge that civil records regarding Ali's other lawsuits would not have been relevant in Douglas' criminal proceedings. Again, the application of the Alaska Rules of Evidence was correctly made. More important, as to all of the information not discovered by attorney Hopper, Douglas has not demonstrated the Alaska Court of Appeals did not misapply federal law or apply federal law in an objectively unreasonable manner as required by § 2254. Additionally, assuming *arguendo* that his counsel's performance was deficient, Douglas has not made the requisite showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different."

---

[1] While the broader question is not raised by the petitioner, this distinction between the Alaska and Federal rules of evidence gives the court some pause. Under the Federal rule, it has been held that a conviction cannot stand if it cannot be said that the error of not admitting impeachment evidence left one with grave doubt that substantial rights were effected, thereby having a substantial influence on the conviction. *See United States v. Oliver,* 492 F.2d 943, 948 (Eighth Cir. 1974). Were it not for the facts of the instant case presenting far more corroborative evidence of wrongdoing by the accused (including the jury's rejection of his own testimony), the court would explore the possibility that the Alaska rule might – in some circumstances – render a trial fundamentally unfair. This case, however, stems from facts significantly different than those in *Oliver*. There, to quote the concurring opinion, "The prosecutor's proof that the defendant had kidnapped the victim rested upon her unsupported testimony, and the defendant was entitled to contest her reliability." *Id.* at 949. Needless to say, the totality of the evidence of Mr. Douglas' case is a far cry from that of *Oliver*. Additionally, in sharp contrast to the case at bar, the impeachment evidence proffered in *Oliver* was extremely compelling.

*Strickland,* 466 U.S. at 694. Rather, a review of the record shows that Douglas own testimony regarding the events of May 13, 1999, was rejected in favor of the far more believable testimony of Ali. It is not the province of this court to second guess the fact finder on such issues. Ergo, Douglas' petition should not be granted on his claim of ineffective assistance of counsel on the ground of failure to investigate and apply what should have been discovered through such investigation, because there is no showing of prejudice under *Strickland* or legal error under § 2254.

**B. The Failure To Introduce The Tapes Of Ali's Prior Statements**

Douglas contends that it was also ineffective assistance of counsel for Douglas' trial attorney to fail to introduce (play) the tapes of Ali's prior statements to the 911 dispatcher and Officer for the purpose of impeaching Ali's testimony. His theory – which is not disputed – is that Ali's statements on those tapes constituted prior inconsistent statements. This issue is readily dispensed with. The attorney's decision not to play the tapes for fear that they might detract from what he felt was a productive cross-examination of Ali was a tactical decision. Hopper's testimony at the hearing on the motion for new trial showed the he made a textbook conscious decision to forgo the use of the tapes. Strategic decisions made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Id.* at 690-691. It is not the province of the court to second guess such decisions, and there is no need to belabor this point here. Thus, Douglas' claim of ineffective assistance of counsel based on the failure to introduce the tapes is without merit.

**C. The Decision Not To Include The Lesser Included Offense Instruction**

According to Douglas, he was entitled to a lesser-included offense instruction on the offense of theft. Douglas rejects the trial court's finding his attorney's testimony credible that he was adamant that a lesser-included theft instruction not be requested. Douglas also points out that, in contrast to other attorney-client contacts

between them, such discussions were never documented by Hopper. Ergo, he submits that trial court's credibility determination was erroneous. Next, Douglas segues into arguing that the trial court's credibility determination was inapposite because Hopper did not revisit the question of a lesser-included offense instruction after Douglas' "disastrous testimony". Not surprisingly, Douglas offers no basis in law for these conclusions, and the court finds them to be patently without merit.

Lastly, Douglas argues that the state courts were oblivious to a fundamental error in the proceedings. He posits that professional standards for competence require the attorney, not the client, to decide whether to seek a lesser-included offense instruction. Furthermore, Hopper's own testimony shows that he ignored his own professional judgment and abrogated his responsibility to his client. In support of this argument, Douglas submits national standards for professional conduct which provide that counsel is obliged to consult with an accused on the issue, but not defer his or her judgment. ABA Standards For Criminal Justice §§ 4-1.1 & 4-1.1 Commentary (3d ed. 1993); ABA Model Rules Of Professional Conduct, Preamble §§ 14, 21 (2003). Additionally, he points to *Simeon v. State,* 90 P.3d 181, 184-185 (Alaska App. 2004). There, the court cites Alaska Rule of Professional Conduct 1.2(a) which provides:

> In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, whether the client will testify, and whether to take an appeal.

The court in *Simeon* went on to say that the ultimate authority to make other decisions governing trial tactics – including whether to request lesser-included offenses rests with the attorney. *Id.* at 184.

As Douglas notes, *Simeon* was decided since he filed the instant petition, but its source authority (the Alaska Rules of Professional Conduct) were promulgated

in 1993. More important, the court bears in mind that § 2254 requires a finding that (1) the state court's decision was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Douglas has failed to make such a showing. Indeed, as the respondent submits, federal courts, including the Ninth Circuit, have upheld an attorney's decision to acquiesce to a defendant's wish as to how to proceed at trial, and that ABA standards to the contrary serve only as a guide for determining whether an attorney's performance is adequate. *Jeffries v. Blodgett,* 5 F.3d 1180, 1198 (9th Cir. 1993). 'Indeed, the Eleventh Circuit has held that "when a defendant preempts his own attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made."' *Id. citing Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir. 1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct., 3248, 97 L.Ed.2d 774 (1987).

Finally in this regard, the respondent's citation to the record show that Hopper made it clear on several occasions in his testimony at the hearing on the motion for new trial that he (Hopper) felt that a lesser-included offense instruction would have been inconsistent with Douglas' testimony. (*See* Docket No. 54, Tab G at transcript pages 242-245, 250-252, 408-419, 432-438; and Tab F at 27-31, 41-42, and 55). Thus, even taking Douglas' insistence out of the equation, Hopper would not have requested such an instruction as a tactical choice. Given Douglas's description of his own testimony as "disastrous", there is considerable irony in his arguing that Hopper's tactical choice was incompetent. Regardless, this claim is untenable.

## II
## PROSECUTORIAL MISCONDUCT

On the claim of prosecutorial misconduct, the court is first struck by Douglas' reply brief. There, he fails to counter the respondent's argument that the

Alaska Court of Appeals analyzed his argument as a due process claim, and that Douglas never raised an ineffective assistance of counsel claim based upon his counsel's failure to object in the context of the prosecutor's closing argument which he contends constituted prosecutorial misconduct.  This court's review of the record results in the same conclusion.  Douglas begins his argument by claiming that his opening brief on appeal raised both the ineffective assistance of counsel claim and the due process claim in the context of the prosecutor's closing arguments.  This cryptic and shallow reference aside, the court's review of the petition to the Alaska Supreme Court makes it manifestly clear that no such argument was presented.  Therefore, in the petition *sub judice* the alleged prosecutorial misconduct is analyzed in the context of Douglas' due process claim under the Fourteenth Amendment since he has otherwise failed to satisfy the exhaustion requirement of § 2254(b)(1).  As will be seen below this is of no moment since there in fact was not a denial of due process and, consequently, even had the claim been exhausted as an ineffective assistance of counsel claim there could be no showing of prejudice.  *See Strickland* supra.

Douglas posits that he was deprived of due process when in the prosecutor's closing arguments he unfairly vouched for Ali's credibility, wrongly disparaged the defendant and the defense, commented on his personal knowledge about drug deals, and argued facts that were not in evidence.  These matters shall be taken up in the order presented by Douglas.

Both sides agree that the proper inquiry "is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986).  Douglas first contends that the trial was infected with such unfairness when the prosecutor urged the jury to compare the backgrounds of Ali and Douglas.  Specifically, Douglas' crack cocaine use, his loss of parental rights in child protection proceedings, and his past

convictions for crimes of dishonestly, as contrasted with Ali's membership in the Army reserves. By this invocation, he continues, "the prosecutor suggested something not in evidence, *i.e.*, that the U.S. Army Reserve would not "tolerate someone smoking . . . crack cocaine." According to Douglas, this was impermissible because it suggested Ali's testimony was credible with the support of information not introduced as evidence. In support of this argument Douglas states: "It is improper vouching for a prosecutor to suggest a witness's testimony 'is supported by information not introduced as evidence.'" *United States v. Combs,* 379 F.3d 564, 574 (9th Cir. 2004).' This stretches too far the law as discussed by the Ninth Circuit in *Combs* and the other cases cited by Douglas. *See also United States v. Sanchez,* 176 F.3d 1214, 1224 (9th Cir. 1999); *United States v. Boyd,* 54 F.3d 868, 871-872 (D.C. Cir. 1995); *United States v. Molina,* 934 F.2d 1440, 1445 (9th Cir. 1991). In each of those cases the prosecutors had vouched for their witnesses when those witnesses were government agents. Furthermore, the vouching in those cases took on the form of arguing that they would not lie because of their government jobs and, or, the prosecutor offered personal assurances of their credibility. The respondent aptly directs the court to *U.S. v. Perez-Ruiz,* 353 F.3d 1, 9 (1st Cir. 2003) where the court teaches: "A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by, say, imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted." Regarding "the information not introduced in evidence" aspect of Douglas' submitted case law, all those cases related to at least implying personal knowledge outside the record (*i.e.* in *Combs* that the prosecutor knew the government agent would be fired for committing perjury and that someone in his shoes would not take such a risk).

       Here, as the Alaska Court of Appeals found, the prosecutor did not insert unsworn testimony into his argument. Rather, his statements were fair argument

concerning matters testified to. There had been testimony as to the cocaine use, loss of parental rights, and past criminal convictions. Likewise, Ali's circumstances were in evidence.

Next, Douglas claims that it was prosecutorial misconduct when the prosecutor called the defense "repulsive". This, he submits, unfairly maligned the defense attorney. In point of fact, the prosecutor did not malign defense counsel, rather he attacked Douglas' theory of the case as presented through his testimony. There is no basis in law for finding prosecutorial misconduct here. Again, this was fair game during closing argument.

On the other hand, it is true that the prosecutor's remarking that cab drivers had been killed around the Sullivan arena was not in evidence, and was somewhat inflammatory. As the Alaska Court of Appeals found, however, the jury was instructed that attorney's arguments were not evidence. Additionally, as the Alaska Court of Appeals found, these comments were muted in large measure because the theory of Douglas' defense was not that Ali had somehow misunderstood his words or actions as being a robbery. To the contrary, he testified that there was never anything close to a robbery, but instead that Ali willingly gave him the money to purchase Ali cocaine. While the comments should not have been made, it cannot be said that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* at 181. The prosecutor made a mistake. But in the context of the totality of the circumstances it is was a minor mistake.

Douglas urges that the prosecutor also injected his own expertise, effectively testifying in closing argument, when he asserted he knew a lot about the drug trade, "because I used to prosecute drug cases." Again, the context of this comment is critical. The Alaska Court of Appeals summed it up best the following paragraphs:

> *Prosecutor*: Drugs are a part of this ... community.... People usually know a little bit about [drugs] ... through their own

> experiences, or [the experiences of] friends or family.... And I know a lot about it, because I used to prosecute drug cases.... And one of the things that really struck me was [how Douglas] kept talking and bragging about how he could [arrange] this [cocaine] deal-[how] he could get $200 worth of cocaine for $100.
> Now you don't get those kind of deals in pretty much any situation in your life.... Drugs are about money.... [Drug] dealers are sales people.... They've got greed. They have no reason to give [Douglas] any kind of charity. And there isn't a dealer out on [the] street that is going to give you $200 worth of crack cocaine for 100 bucks. Why? Because it doesn't make any sense.
>
> Even though the prosecutor mentioned his professional knowledge of the drug milieu, we do not perceive this argument to rest on the prosecutor's personal knowledge. Rather, the inference that the prosecutor asked the jurors to draw– the inference that Douglas's testimony was not credible because drug dealers would not normally sell their product at a 50-percent discount– was based on common sense and general knowledge. The prosecutor's argument did not constitute plain error.

The Alaska Court of Appeals conclusion regarding the inference fairly drawn from the prosecutor's comments rings true with the court. The injection of personal knowledge of the drug trade was incidental, albeit unfortunate. Again, context rules the day, and applying the *Darden* standard, it cannot be said that the comment in question "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* at 181.

Lastly, the court finds no merit to the claim that it was prosecutorial misconduct to argue taxi drivers are victims who come in [court] and tell the truth. According to Douglas, such statements are the type of inflammatory argument intended to appeal to class prejudices and other irrelevant considerations and encourage juror identification with the crime victims; thereby making this the type of argument which is "beyond ethical bounds". *See Boyle v. Million,* 201 F.3d 711, 717 (sic) (6th Cir. 2000). The court will not recite the facts of *Boyle,* as they in no way resemble the facts

of the present case. Suffice it to say, the prosecutor's comments about taxi drivers as victims were not beyond the pale.

In sum, it is true, these arguments by the prosecutor prejudiced Douglas. But prejudice itself is not the test. Bringing a criminal case in the first place prejudices a defendant. The test is unfair prejudice. More specifically, it is the standard set forth in *Darden supra*. Quite simply, taking the prosecutor's comments individually or cumulatively, there was no unfair/improper prejudice here, as there was no prosecutorial misconduct. Rather, these were the comments of an advocate presenting a portrait of his case to a jury. While a prosecutor is not at liberty to strike foul blows, he is authorized to strike hard ones. *Boyle* 201 F.3d at 717. Douglas has not shown that the decision of the Alaska Court of Appeals was: (1) contrary to clearly established federal law as determined by the Supreme Court of the United States. federal law; or, that the Alaska Court of Appeals decision was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d). Thus, his claims of prosecutorial misconduct necessarily fail.

## CONCLUSION

For the foregoing reasons it is hereby recommended that Mr. Douglas amended petition for writ of *habeas corpus* (Docket No. 13) be **DENIED**. Additionally, the Magistrate Judge remains convinced that the expansion of the record and, or, an evidentiary hearing are not warranted for the reasons discussed at Docket Nos. 111 and 113.

DATED this 1st day of December, 2006, at Anchorage, Alaska.

      /s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to Federal Rule of Civil Procedure 72(b), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **the close of business on December 20, 2006**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed **no later than the close of business on January 5, 2007**.

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).