UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| JERRY LEE DOUGLAS, ) | |
| ) | |
| Petitioner, ) | 3:03-cv-00221 JWS (JDR) |
| ) | |
| vs. ) | ORDER AND OPINION |
| ) | |
| SUPERINTENDENT ZEE HYDEN, ) | [Re:   Motion at Docket 54] |
| ) | |
| Respondent. ) | |
| ) | |

## I.  MOTION PRESENTED

At docket 54, petitioner Jerry Lee Douglas filed his Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.   Respondent Superintendent Zee Hyden responded to the petition at docket 106.  Petitioner replied at docket 116.  At docket 117, Magistrate Judge John D. Roberts filed an initial report recommending that the petition be denied.  At docket 118, petitioner timely filed objections to the report and recommendation.  Respondent responded to petitioner's objections at docket 119.  At docket 120, the magistrate judge filed a final report continuing to recommend that the petition be denied.

## II.  STANDARD OF REVIEW

The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."[1]  When reviewing a magistrate judge's

---

[1] 28 U.S.C. § 636(b)(1).

report and recommendation in a case such as this one, the district court conducts *de novo* review of all conclusions of law,[2] and any findings of fact to which objections have been made.[3]  Uncontested findings of fact are reviewed for clear error.[4]

### III.  BACKGROUND

The court has reviewed the report and recommendation and found that, for the most part, it accurately summarizes the background facts of this case.   Moreover, petitioner does not object to any of the magistrate judge's findings of fact.  Accordingly, the court adopts the summary as its own with the exception of the following statements, which the court does not adopt:

"At that point Douglas put his hand inside his jacket and told Ali to give him all his money or he would kill him."[5]  Based on the evidence, it is not clear to the court whether or not Douglas put his hand inside his jacket.

"Ali later testified that he had not, in fact, seen a weapon and he admitted that he had not told [O]fficer Trull or the 911 operator that Douglas had put his hand inside his jacket as if he had a gun."[6]  Mohammad Ali testified that he did not see a weapon, but that Douglas put his hand under his jacket.[7]  Ali admitted that prior to the morning of the grand jury, he did not tell anyone about Douglas putting his hand under his jacket.[8]

The following facts are particularly relevant to this order:

Based on the information Ali provided to Officer Trull at the scene of the alleged robbery on May 13, 1999, Douglas was charged with robbery in the second degree.  On

---

[2] *Barilla v. Ervin,* 886 F.2d 1514, 1518 (9th Cir. 1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.,* 77 F.3d 1170, 1174 (9th Cir. 1996).

[3] 28 U.S.C. § 636(b)(1).

[4] *Taberer v. Armstrong World Industries, Inc.,* 954 F.2d 888, 906 (3d Cir. 1992).

[5] Doc. 117 at 3.

[6] Doc. 54 at 3.

[7] Trial Transcript at 15, exh. G, doc. 54.

[8] *Id.* at 26.

the morning of August 3, 1999, shortly before his testimony before the grand jury, Ali told his attorney and Officer Trull for the first time that Douglas put his hand underneath his jacket as if he had a weapon. Ali's subsequent testimony before the grand jury states in pertinent part:

> Q    Okay. And what happened in front of the [apartment] building?
> A    And then I took him to - back to Vista Grande, and I stopped the car. And then he put his hand underneath his jacket, and he said in a loud voice that give me the money before I kill you, man. So I didn't take a chance because, you know, just for money, you know.
> Q    What did you think he had underneath his coat?
> A    Oh, I thought he had a gun or something, you know, because he didn't take it out or anything. He just acted under his jacket, you know.[9]
> ....
>
> Q    Okay. Now, when you were talking to Officer Trull, were you kind of upset and shaken about what had happened?
> A    Yes, sir, I was in shock, yeah.
> Q    Okay. Do you think you were able to tell him pretty much everything that you told us today?
> A    Yeah. I tried, you know.
> Q    Okay. One thing that you had - you brought up in the office was that you're not sure if you told Officer Trull the first time when - or when you talked to him at the scene about whether this guy had his hand underneath his jacket and was acting like he had a gun; is that right?
> A    Yes, sir. I'm not sure whether I told him or not.
> A    Okay. But are you sure that's what he did that night?
> A    Yeah. Yes, he did.[10]

Based on Ali's testimony before the grand jury, Douglas was indicted on robbery in the first degree.

During the ensuing criminal trial, the prosecuting attorney asked Ali why he did not tell Officer Trull that he "thought there was something underneath his shirt, with his hand?" Ali responded, "Sir, the question was like: Did you see any weapon? So my

---

[9] Grand Jury Transcript at 21, exh. J, doc. 54.

[10] Grand Jury Transcript at 23, exh. J, doc. 54.

answer was: No, I did not see any weapon."[11]  The prosecuting attorney did not ask Ali whether he told the 911 dispatcher about Douglas acting as if he had a weapon.

On cross examination, defense counsel James Hopper asked Ali if the 911 dispatcher asked him whether a weapon was involved.  Ali said that he did not remember.  Based on a tape of the 911 call, Hopper then asked whether it was possible that the 911 dispatcher asked Ali two times if the robber had a weapon and both times Ali had said, "No."  Ali answered that it was possible.[12]  Hopper did not play the 911 tape or otherwise introduce the tape into evidence.

Hopper also asked Ali why he did not tell Officer Trull at the scene that Douglas gestured as if he had a weapon, Ali answered,

> Yeah.  He didn't ask me whether - you know, did he put his jacket or not, you know.  He didn't ask me this kind of question.  He asked me - the question was whether - did you see any weapon.  I told him straight: No, sir, I didn't see the weapon.[13]

Hopper did not introduce a tape or transcript of Ali's statement to Officer Trull. The transcript of Ali's statement to Officer Trull on May 13, 1999, reads in pertinent part:

> Q  Did he threaten you with a - any kind of weapon? Or anything?
> A  I did not see any weapon, sir.  When he told me give me your money before I kill you, so I just took out the money.
> ....
>
> Q  Okay.  Anything else you can tell me, Mohammad?
> A  Ah.  No...
> ....
>
> Q  Anything else you can tell me?
> A  No.  That's all.  Because I think I was smart enough to save my life.[14]

Hopper also asked Ali why he "suddenly remembered on the morning of the grand jury" that Douglas gestured as if he had a gun.  Ali responded, "Mr. A

---

[11]Trial Transcript at 15, exh. G, doc. 54.

[12]*Id.* at 26.

[13]Trial Transcript at 30, exh. G, doc. 54.

[14]Statement at 000072, 000075, exh. H, doc. 54.

[prosecuting attorney] asked me what happened, to tell him...So I was going through all the story, you know whatever happened, you know."[15]

During closing, the prosecuting attorney pointed out that Hopper had the opportunity to impeach Ali with a transcript or tape, but did not do so. He also advised the jury that "questions by counsel are not evidence" and that if Ali said "I don't remember" in response to a question and a transcript or tape was not introduced, then "there is no evidence."[16]

Douglas was convicted of robbery in the first degree. Douglas filed a motion for a new trial, which the court construed as an application for post-conviction relief.[17] An evidentiary hearing was held during which John Murtaugh, a well regarded criminal defense lawyer, was called as an expert witness. Murtaugh testified that Hopper's attempted impeachment fell below the constitutionally-mandated standard of effective assistance of counsel because he never introduced Ali's prior inconsistent statements as substantial evidence. As to the 911 dispatch tape, Murtaugh testified:

> The dispatch tape did not include representation of a weapon, plus it contained probably the best evidence of Mr. Ali's demeanor right at that point in time. As noted in my report and as noted in your pleadings, the demeanor in the 911 tape was inconsistent with the way Mr. Ali described himself at trial. He was relatively composed, and certainly I think the jury could conclude that the dispatcher asked Mr. Ali a fair question about weapons, weapons display, presence of weapons, and that concept was answered in the negative. That turned out to be very important.[18]

Murtaugh also testified that because Hopper did not introduce the tape or transcript of Ali's statement to Officer Trull, the jury never knew that Officer Trull actually asked Ali if Douglas threatened him with "any kind or weapon, or anything" and that Trull followed this question with a general catch-all question.[19]

---

[15]Trial Transcript at 26, exh. G, doc. 54.

[16]Trial Transcript at 91, exh. G, doc. 54.

[17]Doc. 54, exh. H at 000232.

[18]Evidentiary Hearing Transcript at 96, exh. G, Doc. 54.

[19]*Id.*

At the evidentiary hearing, Douglas's new counsel questioned Hopper about his attempted impeachment of Ali:

> Q    Okay. Did you show him the statement of Officer Trull to show that they did ask him the right question?
> A    I don't believe - I mean - I mean, I don't have any recollection of it, but based on reading what's been filed in this case since, I probably didn't.
> Q    Okay. Now, is there any tactical reason not to show him to impeach him?
> A    At the time I did the cross examination of Mr. Ali, I - certainly, I considered it. And I - as the cross examination developed, I chose not to do it. I mean, I was satisfied with his answers to my questions, and I was satisfied with what I perceived was the impression he was giving to the jury.
> Q    And then Mr. Aarseth came up here and said: He never completed the impeachment; he never got him to admit he made those statements.
> A    Yes.
> Q    That's what was done at closing.
> A    I don't know that those were the specific words, but Mr. Aarseth argued in closing that it was a nice technique, but it wasn't evidence, yes. I mean, specifically those words.
> Q    And isn't that true? If you ask a question and you don't get the...
> A    I would agree.
> ....
>
> Q    Okay. Was there any tactical reason not to play the 911 tape?
> A    At the time - and I had the tape and I had the tape player just for that purpose. But again, based on his answers to my cross examination and what I perceived the impression he was giving the jury, I chose not to do that.[20]

Hopper testified that he did not show Ali his statement and have him read it to the jury because Ali was "squirming," and he wanted him to stay that way. Hopper also testified that he listened to the 911 tape and that Ali did not sound like he was in shock; rather, he was coherent and talkative.[21]

In determining whether Hopper's failure to introduce prior inconsistent statements to impeach Ali amounted to ineffective assistance of counsel, the state trial court concluded:

---

[20] Evidentiary Hearing Transcript at 111, exh. G, doc. 54.

[21] *Id.* at 108.

> The - and the impeachment is purely tactical. I mean, that absolutely comes under the question of what - was the tactical reason why the lawyer did what he did? And I think Mr. Hopper said it was clearly tactical. And, you know, I just don't find any reason to further analyze that.[22]

On review, the court of appeals upheld the trial court's ruling, stating that based on the trial attorney's testimony at the evidentiary hearing, "Judge Andrews found that the trial attorney made a reasonable tactical decision not to introduce the tapes. The judge's finding is amply supported by the record."[23]

## IV.  DISCUSSION

Petitioner Jerry Douglas filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254, alleging he "was denied the right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution" and "was denied a right to due process, i.e., a fair trial, as guaranteed by the Fourteenth Amendment" because of prosecutorial misconduct.[24] The government opposes the petition.

Douglas's petition is governed by the substantive standards of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, the court "may grant habeas relief only when the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[25] The Supreme Court has ruled that "a state court's application of federal law is unreasonable only if it is 'objectively unreasonable.'"[26] In applying the foregoing standards, the court

---

[22] *Id.* at 126.

[23] *Douglas v. State*, Not Reported in P.3d, 2003 WL 21350251, *4 (Alaska App. 2003), attached at exh. G, doc. 54.

[24] Amended Petition at 4, doc. 13.

[25] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting 28 U.S.C. § 2254(d)).

[26] *Id.* at 1109 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2003)).

reviews the "last reasoned decision by the state court, which in this case is the Alaska Court of Appeal's denial of Douglas's motion for a new trial, which was construed as an application for post-conviction relief.[27]

Douglas first contends that he is entitled to relief under § 2254 because he received ineffective assistance of counsel. Douglas specifically argues that his trial attorney, James Hopper, failed to: 1) introduce evidence of Ali's prior inconsistent statements to impeach his testimony at trial, 2) adequately investigate the credibility of the only complaining witness, and 3) ask for a jury instruction on the lesser-included offense of theft. The court first considers Douglas's claim that Hopper's failure to impeach Ali's credibility by introducing Ali's prior inconsistent statements, namely the tape of his 911 call and the tape and/or transcript of his statement to Officer Trull, amounted to ineffective assistance of counsel.

In *Strickland v. Washington*,[28] the Supreme Court established a two-pronged test for determining ineffective assistance of counsel. "To prevail on a Sixth Amendment ineffective assistance claim, a defendant must show that counsel's representation 'fell below an objective standard of reasonableness,' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[29]

Douglas argues that Hopper's failure to introduce Ali's prior inconsistent statements to impeach Ali's credibility fell below an "objective standard of reasonableness" in this case because the entire prosecution rested on the word of the complaining witness. Douglas further submits that "[i]n a first degree (armed) robbery prosecution predicated solely upon the statements of a single complaining witness, the failure on the part of the defense attorney to move into evidence (play for the jury) the

---

[27] *Young v. Runnels*, 435 F.3d 1038,1042 (9th Cir. 2006) (quoting *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004)).

[28] 466 U.S. 668, 685 (1984).

[29] *Runnels*, 435 F.3d at 1042 (quoting *Strickland*, 466 U.S. at 688, 694) (internal citation omitted).

prior inconsistent statements of the witness deprived Mr. Douglas of an effective confrontation of the only evidence against him."[30]  The court concurs.

In *Strickland*, the Supreme Court ruled that "a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."[31]  By not introducing Ali's prior inconsistent statements into evidence, Hopper failed to "render the trial a reliable adversarial testing process" because Ali's credibility and, particularly, Ali's testimony that Douglas gestured as if he had a weapon was not subjected to adversarial testing.[32]

It is well established that introduction of prior inconsistent statements is a primary means of impeachment.  The Ninth Circuit has recognized that "[w]hen exploring the credibility of a government witness who testifies against a criminal defendant at trial, it is axiomatic that the defendant may employ the witness's prior inconsistent statements in order to impeach the credibility of the witness."[33]  "'A prior inconsistent statement is admissible to raise the suggestion that if a witness makes inconsistent statements, then his entire testimony may not be credible.'"[34]  Impeachment evidence of prior inconsistent statements may also be used "as substantive evidence of a contrary conclusion of fact."[35]  In addition, "witnesses may be impeached 'by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.'"[36]  All of the above recognized uses of prior inconsistent statements apply in the case at bar.

In *United States v. Tucker*, the Ninth Circuit reversed a petitioner's conviction in part due to defense counsel's failure to impeach a primary prosecution witness with

---

[30] Doc. 116 at 6-7.

[31] *Strickland*, 466 U.S. at 685.

[32] *Id.* at 688.

[33] *United States v. Adamson*, 291 F.3d 606, 612 (9th Cir. 2002).

[34] *Id.* (quoting *United States v. Bao*, 189 F.3d 860, 865-66 (9th Cir. 1999)).

[35] *Limsico v. U.S. I.N.S.*, 951 F.2d 210, 215 (9th Cir. 1988).

[36] *Adamson*, 291 F.3d at 612 (quoting *Jenkins v. Anderson*, 447 U.S. 231, 239 (1980)).

material prior inconsistent statements which raised significant doubts regarding the truth of his trial testimony.[37] Here, the use of prior inconsistent statements was particularly important because Ali's inconsistent statements not only cast doubt on the reliability of his in-court testimony, they also raised reasonable doubts about whether Douglas actually gestured as if he had a weapon, a required element in proving robbery in the first degree.[38] Moreover, lacking other impeachment evidence, Hopper's only means of discrediting Ali depended on his ability to effectively cross-examine Ali regarding inconsistencies between his testimony at trial and his prior statements. Nevertheless, Hopper failed to introduce the 911 tape containing critical evidence of Ali's demeanor after the alleged robbery and denial to the 911 dispatcher that the robber had a weapon, and the tape of Ali's statement to Officer Trull containing his denial that Douglas threatened him with "any kind of weapon, or anything."

    The state argues that Hopper's failure to introduce evidence of prior inconsistent statements was a strategic decision protected under *Strickland*. "'A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*.'"[39] Accordingly, even if the court assumes that Hopper's failure to introduce Ali's prior inconsistent statements was a matter of strategy or tactics, that does not render it immune from judicial scrutiny - it must be a *"reasonable* strategy."[40] "Certain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective."[41] "'Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel, if some other action would have better

---

[37] 716 F.2d 576, 586 (9th Cir. 1983).

[38] *Adamson*, 291 F.3d at 612 ("This inconsistency cuts to the heart of John's credibility: not only does John's prior silence cast doubt on the reliability of his in-court testimony, but it also raises questions regarding John's motivation to testify.")

[39] *Correll v. Ryan*, 465 F.3d 1006, 1015 (9th Cir. 2006) (quoting *Gerlaugh*, 129 F.3d at 1033))

[40] *Id.* (quoting *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997) (emphasis in original).

[41] *Tucker*, 716 F.2d at 586.

protected a defendant and was reasonably foreseeable as such before trial.'"[42]  Here, given the weakness of the government's case and the fact that it came down to the believability of the complaining witness, the court is satisfied "that a competent lawyer would have recognized the critical importance of using the prior inconsistent statements for impeachment."[43]

The state further argues that "[t]here is no indication that the court of appeals applied the law in an objectively unreasonable manner in affirming Judge Andrews' decision."[44]  This court disagrees.  In determining whether Hooper's failure to introduce Ali's prior inconsistent statements to impeach Ali amounted to ineffective assistance of counsel, the state trial court concluded that Hooper's decision was "purely tactical" and ended its analysis.  The state trial court never reached the issue of whether it was a "reasonable" tactical choice as is required under *Strickland*.[45]  In reviewing the state trial court's decision, the court of appeals erroneously concluded the trial court "found that the trial attorney made a reasonable tactical decision," and affirmed the trial court's finding.

At the evidentiary hearing, Hooper testified that his decision not to introduce evidence of Ali's prior inconsistent statements was based on his belief that his cross examination was going well.  He further testified that Ali was "squirming," and he wanted him to stay that way.  In light of all the circumstances, including the weakness of the government's case, the "all or nothing" defense, the government's burden of establishing that Douglas gestured as if he had a weapon, and the fact that the prosecution rested on the credibility of the complaining witness, Hooper's decision "did not reflect reasonable professional judgment."[46]  Based on the facts of this case and a

---

[42]*Id.* (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)).

[43]*Id.*

[44]Doc. 106 at 24.

[45]*Correll*, 465 F.3d at 1015.

[46]*Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

thorough review of the record, the court is convinced that Hopper's failure to introduce evidence of Ali's prior inconsistent statements reflected a failure to exercise the skill and judgment of a reasonably competent criminal defense attorney.

The court must next consider whether trial counsel's errors and omissions prejudiced the defense. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[47] "Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."[48] "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[49] In making this determination, the court "must consider the totality of the evidence before the judge or jury."[50]

Douglas argues that if Hopper had introduced Ali's prior inconsistent statements, "Ali's credibility would have been undercut significantly," thereby creating "a reasonable probability of a different result in this matter."[51] Douglas further argues that he paid the price of his attorney's failure when "[i]n closing argument, the prosecution hammered on Hopper's failure to introduce Ali's inconsistent statements into evidence."[52] Douglas contends that if Hopper had introduced the statements, "there would have been no basis for such argument, and Hopper would have been able to use Ali's own words and responses to police questioning - not merely Jerry Douglas's testimony - as defense evidence."[53]

---

[47] *Strickland*, 466 U.S. at 691.

[48] *Id.* at 692.

[49] *Id.* at 695.

[50] *Id.*

[51] Doc. 54 at 16.

[52] *Id.* at 21.

[53] *Id.* at 22.

Considering the totality of the evidence before the jury, the court finds that defense counsel's omissions were prejudicial and deprived Douglas of a fair trial. More specifically, Hopper's failure to introduce the prior inconsistent statements "precluded the jury from independently judging the merits of his case."[54] "Adequate cross examination of witnesses is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'"[55] Here, it is undisputed that Ali's prior inconsistent statements concerning a required element of robbery in the first degree were never presented to the jury. The jury "was entitled to have that information presented in order to make an informed judgment as to the weight to place on the witness['s] testimony."[56]

In order to establish robbery in the first degree, the prosecution had to prove beyond a reasonable doubt that Douglas was "armed with a deadly weapon or represent[ed] by words or other conduct" that he was so armed.[57] Had Hopper completed his impeachment of Ali's credibility by introducing his prior inconsistent statements, the factfinder could well have had a reasonable doubt as to whether Douglas gestured as if he had a weapon.

For the reasons stated above, the court finds that Douglas was denied the right to effective assistance of counsel. Because the court finds that Douglas is entitled to a writ of habeas corpus based on his claim of ineffective assistance of counsel, the court does not address the other grounds for relief alleged in Douglas's petition.

## V. CONCLUSION

For the reasons set out above, the court **ADOPTS** the magistrate judge's findings of fact as amended, but **REJECTS** the magistrate judge's recommendation at docket

---

[54] *Tucker*, 716 F.2d at 593.

[55] *Id.* (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

[56] *Id.*

[57] AS § 11.41.500(a).

120.  It is further ordered that petitioner's Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 at docket 54 is **GRANTED**.

    DATED at Anchorage, Alaska, this 5th day of March, 2007.

                                            /s/ JOHN W. SEDWICK
                                  UNITED STATES DISTRICT JUDGE